# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION
-------------------------------------------------------------------x

WILLIAM ROGER CLEMENS,

        Plaintiff,

    -against-

BRIAN McNAMEE,

        Defendant.

-------------------------------------------------------------------x

4:08-cv-00471
Judge Keith P. Ellison

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO RECONSIDER AND PLAINTIFF'S SUPPLEMENT TO MOTION TO RECONSIDER

Richard D. Emery
Debra L. Greenberger
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
*Admitted pro hac vice*

Earl Ward
75 Rockefeller Plaza, 20th Floor
New York, NY
*Admitted pro hac vice*

David R. Miller
David R. Miller, Attorney at Law, PLLC
Attorney at Law
2777 Allen Parkway, 7th Floor
Houston, Texas 77019

*Counsel for Defendant*

## TABLE OF CONTENTS

**PAGE NO(s)**:

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.     Motions for Reconsideration are Disfavored . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    II.    Clemens Cannot Meet the Standard for Reconsideration Because
           McNamee's Statements Were Absolutely Privileged as they Were
           Made to Senator Mitchell as Part of a Federal Investigation . . . . . . . . . . . . . . . . . . 4

    III.   This Court correctly held that the statements to Andy Pettitte do
           not constitute slander *per se* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    IV.   Plaintiff does not, in fact, challenge this Court's determination
           not to assert pendent personal jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## <u>TABLE OF AUTHORITIES</u>

**<u>FEDERAL CASES</u>:**                                                                                   **<u>PAGE NO(s)</u>:**

*Bivens v. Six Unknown Named Agents,*
    403 U.S. 388 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Broussard v. Texas Dept. Of Criminal Justice,*
    No. H-04-1059, 2006 WL 1789053 (S.D. Tex. June 27, 2006) . . . . . . . . . . . . . . . . . . . 4, 5

*Buckley v. Fitzsimmons,*
    509 U.S. 259 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Burnaman v. J. C. Penney Co.,*
    181 F.Supp. 633 (S.D.Tx. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Burzynski v. Aetna Life Ins. Co.,*
    967 F.2d 1063 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Klump v. Nazareth Area High Sch. Dist.,*
    425 F. Supp.2d 622, 638 (E.D. Penn. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Lavespere v. Niagara Machine & Tool Works, Inc.,*
    910 F.2d 167 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Little v. Liquid Air Corp.,*
    37 F.3d 1069 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Ross v. Marshall,*
    426 F.3d 745 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Seiferth v. Helicopteros Atuneros, Inc.,*
    472 F.3d 266 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Shanks v. Allied Signal, Inc.,*
    169 F.3d 988 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7

*Shepherd v. Int'l Paper Co.,*
    372 F.3d 326 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Templet v. HydroChem Inc.,*
    367 F.3d 473 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Ultimate Creations, Inc. v. McMahon,*

515 F. Supp.2d 1060 (D. Az. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Oakland Cannabis Buyers' Co-op.*,
    532 U.S. 483 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**STATE CASES**:

*Brinich v. Jencka*,
    757 A.2d 388 (Pa. Super. Ct. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*CEDA Corp. v. City of Houston*,
    817 S.W.2d 846, 849 (Tex. App.-Hous. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Darrah v. Hinds*,
    720 S.W.3d 689 (Tex. App.-Fort Worth 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 12

*Fourcade v. City of Gretna*,
    598 So.2d 415 (La. Ct. App. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Lee*,
    995 S.W.2d 774 (Tex. App.-San Antonio 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Larson v. Decatur Memorial Hosp.*,
    602 N.E.2d 864 (Ill. App. Ct. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Moore v. Waldrop*,
    166 S.W.3d 380 (Tex. App.-Waco 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 15, 16

*Russell v. Clark*,
    620 S.W.2d 865 (Tex.Civ.App. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Smith v. Cattier*,
    No. 05-99-01643-CV, 2000 WL 893243 (Tex.App.-Dallas July 6, 2000) . . . . . . . . . . . . 7

**FEDERAL STATUTES**:

18 U.S.C. § 1623(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

21 U.S.C. § 811 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Defendant submits this brief and the accompanying Declaration of Debra L.

Greenberger in opposition to (1) plaintiff's March 15, 2009 motion ("Pl. Br.") seeking

reconsideration of this Court's February 12, 2009 opinion ("Op.") and (2) plaintiff's April 1, 2009

memorandum of law supplementing his motion for reconsideration ("Pl. Supp. Br.").

## PRELIMINARY STATEMENT

On February 12, 2009, this Court issued a thorough and well-reasoned opinion,

resolving the legal claims before it. The February 12th opinion granted in part and denied in part

defendant Brian McNamee's motion to dismiss. McNamee recognized that this Court's opinion

was well-considered, and, though he disagreed with the partial denial of his motion, he did not

move for reconsideration.

Not so for plaintiff, Roger Clemens, who seems to be just as committed to flailing

away at the Court's decision as he is in trying to intimidate Brian McNamee. But he can point to

no legal error, no factual error, nothing at all that allows — much less warrants — this Court to

reconsider its 24-page opinion. Instead, Clemens rehashes old arguments, or arguments that he

could have previously made.[1]

Clemens's arguments again lack merit. While he challenges this Court's holding

that, under Texas law, absolute immunity bars Clemens from suing McNamee over McNamee's

statements to the Mitchell Commission, he concedes that the Federal Government required

McNamee to speak to Senator Mitchell in the course of the criminal investigation, and concedes

that statements made in the course of a criminal investigations are absolutely immune from suit.

Pl. Br. at 2, 4. One might think that this resolves the inquiry.

---

[1] Plaintiff filed two briefs opposing dismissal. *See* Plaintiff's Brief in Opposition to Motion to Dismiss the Complaint, May 27, 2008, Docket Entry ("DE") 33; Plaintiff's Brief in Opposition to Motion to Dismiss the Amended Complaint, Aug. 7, 2008, DE 48.

According to Clemens, it does not. For him his anger at the prosecution and the investigators translates into a concocted theory that McNamee has no immunity. Clemens's logical leap fails because, of course, McNamee had no control over the federal investigators, he could not know the purpose of their investigation, and could not know what would further that criminal investigation. No private citizen, approached by the government, could know such things. It is for this reason that the law does not require a witness to be omniscient to be covered by absolute immunity. It requires only that the targeted statements be solicited by the criminal investigators, as McNamee's statements unquestionably were. Thus, if Clemens has a remedy, it is against the prosecutors and investigators, not the witness. But Clemens conveniently chooses to blame the man caught in the middle — McNamee.

Clemens's approach flips the policy priorities as determined by the Texas courts. The purpose of absolute immunity is to encourage witnesses to fully disclose information without fear of retaliatory lawsuits. *Darrah v. Hinds*, 720 S.W.2d 689, 691 (Tex. App.-Fort Worth 1986). That purpose would be subverted if a witness were expected — as Clemens asks this Court to find — to question government investigators as to the underlying purpose of their investigation and make an independent determination of the role of the witness's statements. Clemens's claims are in a parallel universe of legal relationships.

Plaintiff's contention that this Court erred in requiring him to plead special damages stemming from McNamee's allegedly defamatory statements to Pettitte is similarly meritless. Under Texas law, *per se* defamation damages are only available where the pleaded statement clearly — without implication, innuendo, or extrinsic facts — falls into one of the enumerated categories. Here, as this Court specifically concluded, McNamee's alleged statements to Pettitte that Clemens used HGH/steroids did not fall into one of those categories

2

because one must rely on innuendo, implication, logical leaps or extrinsic evidence to support the conclusion that the alleged statements are defamatory.

Finally, Clemens does not even attempt to point to an error in this Court's determination not to exercise its *discretion* to assert pendent personal jurisdiction, a doctrine that (as McNamee previously argued) cannot apply in the circumstances here.

This Court should adhere to its February 12, 2009 decision and deny plaintiff's motion for reconsideration.

## ARGUMENT

### I.   Motions for Reconsideration are Disfavored

The Federal Rules of Civil Procedure "do not provide for a motion for reconsideration." *Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328 n. 1 (5th Cir. 2004). Nonetheless, such a motion may be considered pursuant to Federal Rule of Civil Procedure 59(e) or 60(b). *Id.* Plaintiff's motion does not indicate whether it relies on Rule 59 or 60, however, because "it was filed more than ten days after the district court's order dismissing the suit, it is treated as a Rule 60(b) motion." *Id.*; *see also* Fed. R. Civ. P. 60(b) (providing that a "court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons," and listing six reasons). Because plaintiff did not move within 10 days of this Court's February 12, 2009 order, the Court must hold his motion to the more stringent standard applicable to Rule 60(b) motions for reconsideration. *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 173-74 (5th Cir. 1990) (explaining that Rule 60(b) motions have more "exacting substantive requirements," as compared to the more lenient standard of Rule 59(e)), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.14 (5th Cir. 1994).

The Fifth Circuit has held that a motion for reconsideration (even in the less stringent 59(e) context) must "clearly establish either a manifest error of law or fact or must present newly discovered evidence. These motions cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005) (internal quotation omitted). "Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004). This Court has held: "A motion for reconsideration may not be used to rehash rejected arguments or to introduce new ones that could have been offered earlier." *Broussard v. Texas Dept. of Criminal Justice*, No. H-04-1059, 2006 WL 1789053, at *1 (S.D.Tex. June 27, 2006) (Ellison, J.).

Plaintiff's motion must fail because Clemens merely "rehash[es] rejected arguments" and he does not point to any legal or factual error. The "extraordinary" remedy of overturning a final order is simply inappropriate here, as the underlying issues were extensively briefed and this Court issued a thorough opinion after hearing oral argument.

## II.   Clemens Cannot Meet the Standard for Reconsideration Because McNamee's Statements Were Absolutely Privileged as they Were Made to Senator Mitchell as Part of a Federal Investigation

Plaintiff's motion for reconsideration and his supplementary brief attempt to present various arguments to support his claim that this Court should reconsider its holding that McNamee's statements were absolutely privileged.[2] Fundamentally, however, Clemens has

---

[2] This Court questioned whether this absolute privilege is an "absolute immunity" from suit or "merely a defense to defamation claims," and ultimately held that "the result in the instant case is the same." Op. at 17. While Clemens argues that the privilege is merely an affirmative defense, he does not dispute this Court's determination that this is a distinction without a difference, nor does he seek reconsideration on this ground. Pl. Br. at 3 n. 2. Furthermore, even if plaintiff is correct as to the holding in *In re Lee*, 995 S.W.2d 774, 776 (Tex. App.-San Antonio 1999), there is precedent from another Texas Court of Appeals squarely holding that an "absolute privilege is not a defense . . . absolutely privileged communications are not actionable." *CEDA Corp. v. City of Houston*, 817 S.W.2d 846, 849 (Tex. App.-Hous. 1991), *cited in*

4

failed to make the only argument that matters: that this Court has misapplied controlling (or even persuasive) authority, or that the federal investigators did not solicit and compel McNamee's statements to the Mitchell Commission as part of its ongoing investigation.

Instead, the thrust of Clemens's motion is essentially a policy argument, dressed in various guises. He claims that the prosecutors and Senator Mitchell somehow acted inappropriately by compelling and publishing, respectively, McNamee's statements. And he then asserts — in an argument which seems to be a non-sequitur — that this Court can and should punish the prosecutors by ruling that McNamee must defend himself in this defamation lawsuit. Clemens does not explain or address why, if he believes that the federal investigators and Senator Mitchell are the wrongdoers, he has not named them as defendants and directed his litigation against them. But in any event, he cannot ask this Court to punish McNamee for responding to prosecutors who, Clemens contends, acted wrongfully.

As an initial matter, plaintiff's policy argument is improper on a motion for reconsideration. Clemens is simply expanding on an argument he previously presented to, and was rejected by, this Court. *Compare* Pl. Opp. Br., Aug. 8, 2008, DE 48, at 66, 70, *with* Op. at 17 ("As a matter of public policy, McNamee's statements to Mitchell should be protected."). Clemens cannot use a reconsideration motion to "rehash rejected arguments," *Broussard,* 2006 WL 1789053, at *1, or "raise arguments which could, and should, have been made before the judgment issued," *Ross*, 426 F.3d at 763.

Plaintiff can demonstrate no error whatsoever, let alone <u>manifest</u> legal error, as required by the stringent standard for motions for reconsideration. *Id.* Indeed Clemens cites no authority supporting his claim that this Court erred. Notably, he concedes that under Texas law

---

*Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 992 (5th Cir. 1999). A split in authority amongst the Texas Courts of Appeals is of no significance given the Fifth Circuit's holding that the privilege is "a complete immunity from suit, not a mere defense to liability," *Shanks,* 169 F.3d at 991-92.

statements made in the course of judicial proceedings are absolutely immune from suit. Pl. Br. at 2. He further concedes that the chief case that this Court relied upon, *Shanks v. Allied Signal, Inc.*, 169 F.3d 988, 993-95 (5th Cir. 1999), found that "certain government criminal investigations are treated as judicial proceedings." Pl. Br. at 3. Instead, plaintiff, in essence, is now asking this Court to apply the same precedents to reach a different conclusion. This he cannot do under the stringent test for a motion for reconsideration. As Clemens has failed to meet his heavy burden, this Court need not, and cannot, reconsider its prior decision.

Nor does Clemens contend that this Court made any errors of fact. While Clemens asserts that McNamee's statements were made to "private individuals performing private investigations," Pl. Br. at 7, he does not, and cannot, dispute this Court's finding that federal prosecutors compelled McNamee to speak with the Mitchell Commission, Op. at 16-17. He does not dispute this Court's finding that AUSA Parella's investigation was an "ongoing proceeding," in which "Parella compelled McNamee to speak to Mitchell," including by arranging and participating in the meetings between McNamee and Mitchell. *Id.* Indeed Clemens admits that the "DOJ chose to leverage McNamee's cooperation agreement to require him to speak to Senator Mitchell." Pl. Br. at 4.[3]

Instead, Clemens attempts a smokescreen by contending that the prosecutors acted improperly — by having McNamee speak to Mitchell, or seeking to investigate athletes in an investigation supposedly focused on distributors, or by having McNamee name names. But these contentions ignore the underlying justification for absolute immunity: The purpose of

---

[3] Despite this admission, Clemens again misleadingly cites only portions of the Mitchell Report. Pl. Br. at 11-12. The Mitchell Report confirms AUSA Parella's declaration: namely that McNamee met with Mitchell at the U.S. Attorney's Office's request, federal prosecutors and agents participated in the meetings with Mitchell and McNamee, and McNamee faced criminal charges if he made any false statements during these interviews. *See* Def. Mot. to Dismiss, July 2, 2008, DE 40, at 29 (citing Mitchell Report at 167-68, attached as Exhibit ("Ex.") 11 to that submission).

immunity is to encourage "full disclosure from witnesses without fear of retaliatory lawsuits for defamation of any sort." *Darrah*, 720 S.W.2d at 691. A witness cannot know the prosecutor's internal guidelines, nor can he know the ultimate focus of an investigation, nor can he know what will ultimately further the Government's investigation. Instead, a witness's knowledge is limited to the basic question of whether the Government has solicited or compelled the statement or whether the witness has volunteered this information, unsolicited. *See Shanks*, 169 F.3d at 991.

The question is not what the prosecutors should or should not have done.[4] The question is what a private citizen should do when contacted by federal investigators: Should they truthfully comply? Or should they hold back, fearing a defamation prosecution? It is for this reason that the line in the sand is whether the statement is solicited or unsolicited, not whether the witness's statements "furthered the investigation," as Clemens claims, Pl. Br. at 8.

Clemens contends that this Court must determine whether McNamee's statements "furthered the investigation" by the Federal Government. But, to so argue, he belatedly grasps at unrelated privileges. The question, however, in the witness-immunity context, is whether the Government investigator approached him ("solicited" the statements) and required the witness to speak in order to comply with the Government's investigation. *Shanks,* 169 F.3d at 991; *see also Smith v. Cattier,* No. 05-99-01643-CV, 2000 WL 893243, at * 4 (Tex.App.-Dallas July 6, 2000) (not designated for publication).

---

[4] It is not this Court's or McNamee's place to weigh in on whether the federal investigators complied with their *internal* guidelines. Defendant does note, however, that the statement Clemens quoted from the *Principles of Federal Prosecution* expressly carves out an exception where there is a "significant justification" compelling disclosure. Pl. Br. at 5. The Government may have decided that the desire to shed light on baseball players' use of steroids justified naming names. Indeed, the story Clemens attached as Exhibit 2 to his motion stated that "surveys . . . show steroid use by teenagers has dropped significantly." Josh Peter, *Credit Uncle Sam With Assist in Battle vs. Steroids*, Yahoo! Sports, December 12, 2007, at http://sports.yahoo.com/mlb/news?slug=jo-mitchelladvance121207.

Clemens newly-minted contention relies on wholly distinct privileges—privileges granted to attorneys and to prosecutors—which are grounded in very different policy rationales.[5] By contrast, the privilege attaching to witnesses is grounded in the principle that, when solicited by the Government, citizens should comply without fear of subsequent litigation. Unlike an attorney or a prosecutor, a witness does not and cannot know what would ultimately "further" the investigation.

First, Clemens looks to privileges that apply to attorneys' actions, citing *Russell v. Clark*, 620 S.W.2d 865, 868 (Tex.Civ.App. 1981) and *Burzynski v. Aetna Life Ins. Co.*, 967 F.2d 1063, 1068 (5th Cir. 1992). In *Russell*, the Court of Civil Appeals of Texas held that an attorney's allegedly-false letter to a corporation's investors, written to seek evidence for a pending litigation, was absolutely privileged. The Court reiterated that the doctrine of absolute privilege is "founded on public policy, and it is considered in the interest of public welfare that all persons should be permitted to utter their sentiments and speak their thoughts freely and fearlessly upon all questions and subjects." *Id.* at 868. *Russell* extended that doctrine to "out-of-court communications made by attorneys preliminary to judicial proceedings," so long as the statement "bear[s] some relationship to a judicial proceeding in which the attorney is employed, and [is] in furtherance of that representation." *Id.* *Burzynski* applied *Russell* and held that where an attorney sends letters that were unrelated to the proceeding for which he was retained, those letters were not in furtherance of the attorney's representation of their clients. 967 F.2d 1063, 1068. The defendants in *Russell* and *Burzynski* were attorneys who knew the topic of their

---

[5] It is particularly ironic that Clemens now relies on cases involving out-of-court statements by attorneys to third-parties. *See* Pl. Br. at 8-9. He earlier declared that it would be "mixing apples and oranges" to look to caselaw concerning attorney immunity. Pl. Opp. Br., Aug. 7, 2008, DE 48, at 65 n.19. He stated: "[D]iscussions and standards applied with regard to attorney-immunity are inapplicable when attempting to assert the witness-based privilege."

representation of their client and could be held responsible for statements that were outside that representation.

Contorting this doctrine, Clemens attempts a false analogy to the limits on absolute immunity granted to prosecutors. Here he relies on *Buckley v. Fitzsimmons*, 509 U.S. 259, 277 (1993), which held that a prosecutor's statements to the media were not covered by the absolute privilege as "[c]omments to the media have no functional tie to the judicial process." But *Buckley* is simply inapplicable: to the extent Clemens contends that the prosecutors had McNamee make statements at their behest that are not covered by absolute privilege, those prosecutors are the logical target for his lawsuit. If Clemens contends that the prosecutors are attempting an end-run around *Buckley,* then he should sue the prosecutors and argue that the *Buckley* exception does not protect their conduct.[6] Clemens has conveniently chosen not to do that. Furthermore, even adopting *Buckley*'s functional approach, McNamee's function was as a cooperating witness; his function was to cooperate with the prosecutors, to comply with the prosecutors demands when the prosecutors required. His function was not to question the prosecutors' actions.

For this same reason, Clemens's supplement to his motion to reconsider, filed on April 1, 2009, rather than unveiling a "smoking gun" which would support a belated submission, does not alter the analysis of McNamee's actions in complying with the Government's investigation. McNamee could not know the Government's ultimate target for its investigation; he was approached by the Government and truthfully complied with an ongoing criminal investigation. No more can be demanded of him to assert absolute immunity.

---

[6] For this reason, plaintiff's contention that this Court is "incentiviz[ing]" the Federal Government's "questionable tactics," Pl. Br. at 6 — besides being highly unlikely, as a factual matter — fails. There is no "incentive" for investigators to act inappropriately because the individual federal investigators and prosecutors can themselves be sued and be personally liable for damages. *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

It is also worth noting that, as an attempt to claim Government inconsistency, the citation of *United States v. Tammy A. Thomas,* Cr. 06-0803, demonstrates the exact opposite. Pl. Supp. Br. at 2 and Ex. 1. It begs the question, who is Tammy Thomas? She is not a steroid distributor. She is an athlete. Specifically, she is a cyclist who lied to a grand jury about her use of steroids. Ex. 1 to Pl. Supp. Br., at 3-4. In April 2008, she was convicted of perjury and obstruction of justice. *Id.* at 7. Why was the Government investigating her? She was a possible witness because she tested positive for steroids and therefore may have had "direct knowledge" of the substances' manufacturer. *Id* at 8. Indeed, investigators often rely on end-users to lead them to dealers.[7] When athletes lie in the course of an ongoing criminal investigation — in Thomas's case, those lies were to a grand jury, in Clemens's case they were to federal investigators and Congress — those lies impede the Government's ability to prosecute the "targets" of their investigation. For that reason, though end-user athletes may not have been the targets of the investigation, athletes who lied were indicted and convicted.[8]

Indeed, to secure a conviction against Tammy Thomas, the Government had to prove that the lies were "material." *See* 18 U.S.C. § 1623(a). Furthermore, as the Government's brief in *United States v. Thomas* makes clear, the Government considered as targets those athletes that were also distributors. Ex. 1 to Pl. Supp. Br., at 21. Thus, it is beyond hubris for Clemens to claim that investigating his use of steroids did not "further" the Government's investigation: it is for the Government to decide how to conduct its investigations and here it

---

[7] Clemens's contention that McNamee is an "admitted drug dealer," Pl. Supp. Br. at 1, is both designed to offend (after all, it was Clemens, and not McNamee, who instigated Clemens's use of steroids) and irrelevant as investigators often seek the cooperation of many people along a distribution chain to convict the "kingpin."

[8] Tammy Thomas is not the only athlete who was charged with perjury in the course of the BALCO investigation. Marion Jones, Barry Bonds, and Miguel Tejada are all athletes who were charged, indicted and/or convicted of lying in connection with the Government's investigation of performance enhancing drugs. None were alleged to have been drug distributors.

10

made the (very reasonable) decision that investigating users could lead them to higher-level

distributors. Additionally, many investigations begin with one target and, by amassing

additional information, the focus of the criminal investigation shifts. Altering in response to

additional information is prudent crime-solving and laudable.

Furthermore, Clemens's repeated insinuation that McNamee could somehow "get

away" with falsehoods about Clemens and that Clemens is being deprived of a forum to "attempt

to disprove the government's case," is otherworldly. Pl. Br. at 11. McNamee had to be truthful:

when he spoke to the Mitchell Commission he was told by the federal prosecutors that he would

be prosecuted for any false statements. Parella Decl., Dec. 17, 2008 at ¶ 3. Additionally — at

Clemens's request — Congress held a day-long hearing as to McNamee's statements. Chairman

Waxman stated that after his office had investigated the statements in the Mitchell Report he

wanted to "cancel this hearing and issue a written report . . . present[ing] the results of our

investigation." Transcript of Hearing before Committee on Oversight and Government Reform,

House of Representatives, Feb. 13, 2008, at 4, *attached* as Exhibit A to Greenberger Decl. At

that point, however, "Mr. Clemens' attorneys . . . thought it would be unfair if the committee

issued a report without giving Mr. Clemens the opportunity to testify in public. So [Chairman

Waxman] decided to proceed with [the] hearing." *Id.* (emphasis added). After that hearing,

wherein Clemens had ample opportunity to attempt to disprove McNamee's statements, on

February 27, 2008, the Republican and Democratic ranking members of the House Committee

on Oversight and Government Reform asked the U.S. Department of Justice to investigate

whether Clemens committed perjury under oath when he denied any use of illegal drugs. Letter

from Waxman and Davis to DOJ, Feb. 27, 2008, *attached* as Exhibit B to Greenberger Decl.

The request did not ask that McNamee be investigated.[9] *Id.* Additionally, by virtue of Clemens's celebrity, every statement he makes denying his use of steroids and HGH has been widely covered by the nationwide media. This is not a man who cannot tell his side of the story.[10]

Clemens's approach flips judicial priorities and must be rejected. As this Court recognized, it is McNamee that has a right not to be dragged into court to defend his truthful statements that were made to further a federal investigation. It is imperative that judicial witnesses speak freely and openly "without fear of retaliatory lawsuits for defamation of any sort." Op. at 17 (quoting *Darrah,* 720 S.W.2d at 691). This Court should adhere to its decision and deny Clemens's motion for reconsideration.

**III.    This Court correctly held that the statements to Andy Pettitte do not constitute slander *per se***

This Court correctly held that that McNamee's statements to Pettitte that Clemens had used steroids and HGH were not slander *per se* and correctly required Clemens to plead special damages: "Given that McNamee did not specifically tell Pettitte that Clemens was using steroids knowingly and without a prescription, McNamee statements to Pettitte do not rise to the level of slander per se." Op. at 21. Clemens ignores the Court's analysis in alleging that the Court "never applied" the test it properly identified. Pl. Br. at 14. This Court found that McNamee's statements were defamatory, i.e. capable of exposing Clemens to contempt or

---

[9] Obviously a Congressional hearing is not a direct substitute for a jury trial. Nonetheless, Clemens's contention that, from a policy perspective, he should have the right to present his case, ignores that he has tried — and failed — to do so.

[10] Nor is Clemens's contention that the Government "never intends to prosecute" accurate. Pl. Br. at 6. A grand jury has been impaneled, and some press reports have reported that Clemens expects that he will be indicted. *See* Michael O'Keefe and Nathaniel Vinton, *Obama's new Attorney General sitting out Roger Clemens' steroid probe,* N.Y. Daily News, Mar. 10, 2009, attached as Exhibit C to Greenberger Decl.

ridicule,[11] but appropriately found that they were not slanderous *per se* because another

reasonable interpretation of those statements is that they are not defamatory, and thus must rely

on innuendo to attempt to fit into one of the enumerated *per se* categories. Op. at 20.

       The crucial legal requirement is that a statement cannot be slander *per se* if it

requires innuendo or implication. The Texas Court of Appeals explained this distinction quite

clearly in *Moore v. Waldrop,* 166 S.W.3d 380 (Tex. App.-Waco 2005), a case that this Court

repeatedly relied upon, Op. at 19-21, but Clemens conspicuously ignores. *Moore* held that a

statement — to an employer — that, "You don't want to hire him, he's a crook," was not slander

*per se.* 166 S.W.3d at 383, 387. The Court explained:

> Innuendo is extrinsic evidence used to prove a statement's
> defamatory nature. . . . Considering the surrounding circumstances
> does not necessarily require the use of extrinsic evidence. . . .
> Common sense requires courts to understand the statement as
> ordinary men and women would, considering the temper of the
> times, and the current of contemporary public opinions. If the
> statement seen in this light has but one clear and obvious meaning,
> then no further inquiry is necessary. However, if the statement is
> ambiguous, or if the full effect of the statement cannot be
> understood without the use of extrinsic evidence, then the trial
> court must go beyond the snapshot of time in which the statement
> was published and admit into consideration inducements and
> explanatory circumstances.
>
> Accordingly, when dealing with the initial question of whether a
> statement is slanderous, a trial court should look to innuendo and
> explanatory circumstances in order to interpret the meaning of the
> statement. . . .Yet, once innuendo is being considered, the
> statement has moved beyond the analysis of slander *per se* and into
> that of slander *per quod* . . . .

*Id.* at 385-86. Moore had contended that the defendant's statement was slanderous *per se*

because those who heard it knew what defendant meant when he called Moore a crook, and

---

[11] While McNamee had argued that these statements were not defamatory as a matter of law, this Court
held otherwise. Op. at 17-19. McNamee did not move for reconsideration and, for purposes of opposing
this motion for reconsideration, McNamee does not dispute the Court's conclusion that the alleged
statements were defamatory.

knew that he was referring to allegations that Moore had committed a crime by falsifying

government records. The Texas court rejected that argument. It held that it would require

innuendo to consider the extrinsic evidence of the meaning of defendant's statement and

"innuendo should never be considered when interpreting slander *per se*." *Id.* at 386.

As this Court found, that is equally true of McNamee's allegedly defamatory

statements to Andy Pettitte: "McNamee did not specifically tell Pettitte that Clemens was using

the steroids knowingly and without a prescription." Op. at 21. Like the statement that someone

should not be hired because he is a crook, McNamee's statements as alleged in the Complaint do

not, on their face, accuse Clemens of any crime or injure his business. While a listener may have

reached the conclusion that this statement injured Clemens (as follows from this Court's

conclusions that the statements to Pettitte are "reasonably capable of defamatory meaning, Op. at

20), the statements — on their face — do not compel such a conclusion. *Cf.* Op. at 20 ("it is

*likely* that Pettitte understood that Clemens was using HGH or steroids without a prescription

from a medical doctors" (emphasis added).) Indeed, steroids and HGH are routinely prescribed,

and it is only through innuendo that the listener might believe that McNamee was contending

that Clemens had no prescription. Nor did McNamee allegedly state that Clemens knowingly

used steroids/HGH.

Clemens attempts to fill in these gaps by making unsupported statements about

what the general public "would have understood." Pl. Br. at 17. But the question cannot be

based on conjecture about what a listener might have understood. The test is whether the

statement "clear[ly] and obvious[ly]" falls within one of the enumerated *per se* categories.

*Moore*, 166 S.W.3d at 386. Here, there is nothing in the context of McNamee's statements to

Pettitte that Clemens had used HGH and steroids — as alleged in the Complaint — that would

make it clear that Clemens used those substances without a prescription and knowingly. While a listener might have jumped to that conclusion, a listener might also have reached the contrary conclusion, as this Court found. Where a statement is not obvious on its face, and the listener must rely on conjecture and innuendo, only slander *per quod* is pleaded, not slander *per se*.

The cases Clemens cites, Pl. Br. at 16-18—all from outside Texas—are inapposite, as examination of those statements reveals that they do not rely on innuendo for interpretation. None of the cases even analyze the question of whether the statements do not constitute slander *per se* because they rely on innuendo. In *Larson v. Decatur Memorial Hosp.*, 602 N.E.2d 864, 798-99 (Ill. App. Ct. 1992), the underlying statement was that plaintiff was "selling and using marijuana on hospital premises." Selling marijuana is illegal in Illinois. *Id.* at 799. In *Ultimate Creations, Inc. v. McMahon*, 515 F. Supp.2d 1060, 1063- 1067 (D. Az. 2007), the statement was that plaintiff was fired for violating his employer's drug policy. There it was "clear and obvious" that the drug use was improper, as the defendant stated that plaintiff was violated the policy. Similarly, in *Klump v. Nazareth Area High Sch. Dist.*, 425 F. Supp.2d 622, 628, 638 (E.D. Penn. 2006), the student was accused of being a "drug dealer," clearly more than an accusation that someone took a prescription drug. In *Brinich v. Jencka*, 757 A.2d 388, 397 (Pa. Super. Ct. 2000), the defendant allegedly stated that plaintiff had a drug problem and was using his employer's funds to support his habit. (To the extent *Brinich* upheld the finding of slander *per se* while characterizing the testimony as based on the implications and insinuations of defendant's statements, *Brinich* is at odds with *Moore*.) Finally, in *Fourcade v. City of Gretna*, 598 So.2d 415, 421 (La. Ct. App. 1992), the statement was that plaintiff: "got kicked out the Academy. And, I said, what for? He says, using steroids." Here the context of the "using

15

steroids" statement indicates that it was used without a prescription, as it caused the student to be expelled.

Nor are Clemens's outlandish hypotheticals on-point. First he argues that "John regularly beats his wife" is clearly slander *per se* but claims that under this Court's approach it would not be because it might mean that he beats her "at bowling." Pl. Br. at 15. Clemens is wrong.[12] Context matters: if the statement is made while looking at a bowling score sheet, where John received a perfect score of 300, the statement would have "but one clear and obvious meaning." *Moore*, 166 S.W.3d at 386. Pushing this hypothetical to its limits, if it is made in the context of both a perfect score sheet and John's wife appearing bruised, the statement – while capable of being defamatory – would require extrinsic evidence to determine the speaker's innuendo. The question is not whether "additional facts could be added" to McNamee's statements to Pettitte to make them not defamatory, Pl. Br. at 16. This Court has already found that the statements were capable of defamatory meaning. The question is whether the statements — without any additional facts — unambiguously accuse plaintiff of a crime or injure his profession. They do not. *See Burnaman v. J. C. Penney Co.*, 181 F.Supp. 633, 636-37 (S.D. Tx. 1960) (statements from J.C. Penney employees of "What did you do with the merchandise?" and "Where is that red dress?" did not constitute slander *per se* because to construe these statements as an accusation of theft required innuendo).

As McNamee's allegedly defamatory statements to Pettitte do not constitute defamation *per se,* this Court should adhere to its ruling requiring Clemens to plead special damages.

---

[12] Plaintiff's "medical marijuana" hypothetical, Pl. Br. at 16, is even more outlandish, as marijuana use is a federal crime, even in California. *See* 21 U.S.C. § 811; *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483 (2001).

**IV.    Plaintiff does not, in fact, challenge this Court's determination not to assert pendent personal jurisdiction**

At the end of his extensive brief, plaintiff includes less than a page urging this Court to exercise pendent personal jurisdiction. He concedes that this doctrine—if it exists at all—is, at best, discretionary (Pl. Br. at 18: "the Court was permitted to exercise pendent personal jurisdiction") and does not argue that this Court erred in failing to exercise its discretion. This is the basest sort of rehashing of rejected arguments, and is wholly improper in a reconsideration motion.

Furthermore, as McNamee pointed out in his motion to dismiss briefing, the Fifth Circuit has made clear that a "plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction *for each claim*." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006) (emphasis added). Indeed, as Clemens has conceded, the Fifth Circuit has *never* upheld any assertion of jurisdiction pursuant to the doctrine, and, though other Circuits have applied the doctrine, they have generally done so in the context of assertions of federal question jurisdiction, not diversity jurisdiction. *See* Pl. Opp. Br., Aug. 8, 2008, DE 48, at 29; Def. Reply Br., DE 55, at 15-16.

More fundamentally, pendent personal jurisdiction cannot be asserted where, as here "the claim falling outside the reach of the forum state's long-arm statute arises from a separate set of facts." 4A Wright & Miller § 1069.7. The two claims are based on statements made years apart, to different audiences, in entirely different contexts: Any defamation claim arising out of any statements McNamee made to Pettitte in 1999/2000 or 2003/2004, Am. Compl. ¶ 36, is a different claim arising from different set of facts than any claim arising from McNamee's alleged statements to Senator Mitchell and SI.com, over which this Court has held that it lacks jurisdiction.

This Court must again decline to assert pendent personal jurisdiction.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that this Court should deny

Clemens's motion for reconsideration and adhere to its February 12, 2009 decision.

Date:  April 15, 2009                    Respectfully Submitted,
New York, NY


_____s/_____
Richard D. Emery (RE 5181)
Debra L. Greenberger (DG 5159)
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Telephone (212) 763-5000
Fax (212) 763-5001
Admitted *pro hac vice*


_____s/_____
Earl Ward (EW 2875)
75 Rockefeller Plaza. 20th Floor
New York, NY 10019
Telephone (212) 763-5000
Fax (212) 763-5001
Admitted *pro hac vice*


_____s/_____
David R. Miller, Attorney at Law, PLLC
Federal ID No. 7066, State Bar No. 14067500
2777 Allen Parkway, 7th Floor
Houston, Texas 77019
Telephone: (713) 579-1568
Fax: (713) 579-1528

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of April 2009, a true and correct copy of the foregoing instrument was served upon all counsel of record in accordance with the Federal Rules of Civil Procedure, *to-wit*:

Rusty Hardin
Derek Hollingsworth
Andy Drumheller
Joe Roden
Terry Kernell
Rusty Hardin & Associates, P.C.
1401 McKinney, Suite 2250
Houston, Texas  77010
(713) 652-9000
(713)  652-9800 (facsimile)


_____s/_____
Debra L. Greenberger

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION
--------------------------------------------------------------x
WILLIAM ROGER CLEMENS,

    Plaintiff,         4:08-cv-000471
                Judge Keith P. Ellison

  -against-

BRIAN McNAMEE,

    Defendant.
--------------------------------------------------------------x

## DECLARATION OF DEBRA L. GREENBERGER

    DEBRA L. GREENBERGER declares, under penalty of perjury, pursuant to 28

U.S.C. § 1746, that the following is true and correct:

1.  I am associated with the firm of Emery Celli Brinckerhoff & Abady LLP, attorneys for
   Defendant Brian McNamee. I submit this declaration in opposition to plaintiff's March
   15, 2009 motion seeking reconsideration of this Court's February 12, 2009 opinion and
   plaintiff's April 1, 2009 memorandum of law supplementing his motion for
   reconsideration.

2.  Attached hereto as Exhibit A is a true and complete copy of an excerpt of the Transcript
   of the Hearing before the Committee on Oversight and Government Reform, House of
   Representatives, dated February 13, 2008.

3.  Attached hereto as Exhibit B is a true and complete copy of a letter from Henry A.
   Waxman and Tom Davis, Chairman and Ranking Minority Member, respectively, of the
   House of Representatives' Committee on Oversight and Government Reform, to Attorney
   General Michael Mukasey, dated February 27, 2008.

4.  Attached hereto as Exhibit C is a true and complete copy of the March 10, 2009 N.Y.
   Daily News article, entitled *Obama's new Attorney General sitting out Roger Clemens'*
   *steroid probe*, by Michael O'Keefe and Nathaniel Vinton.

Dated:      April 15, 2009
            New York, New York

                                    _____s/_____

                                    Debra L. Greenberger
                                    Emery Celli Brinckerhoff & Abady LLP
                                    75 Rockefeller Plaza, 20th Floor
                                    New York, NY 10019
                                    Telephone (212) 763-5000
                                    Fax (212) 763-5001
                                    *Admitted pro hac vice*

                                    *Counsel for Defendant*

# Exhibit A

# THE MITCHELL REPORT: THE ILLEGAL USE OF STEROIDS IN MAJOR LEAGUE BASEBALL, DAY 2

## HEARING

BEFORE THE

## COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM HOUSE OF REPRESENTATIVES

ONE HUNDRED TENTH CONGRESS

SECOND SESSION

FEBRUARY 13, 2008

## Serial No. 110–63

Printed for the use of the Committee on Oversight and Government Reform



Available via the World Wide Web: http://www.gpoaccess.gov/congress/index.html
http://www.house.gov/reform

U.S. GOVERNMENT PRINTING OFFICE

43–333 PDF          WASHINGTON : 2008

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov  Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104  Mail: Stop IDCC, Washington, DC 20402–0001

4

Mr. Pettitte injected himself twice with HGH when he was recovering from an injury.

Mr. Pettitte had never told anyone outside of his family about this incident, but he volunteered it during the deposition because he wanted to provide a complete record to the committee. Mr. Pettitte also provided additional information of particular relevance to this hearing, which I will describe later in my statement.

On behalf of the committee, I want to commend Mr. Pettitte for his cooperation. He found himself in an extremely uncomfortable position, but he did the right thing and told the truth. During his deposition, he was asked how he approached this difficult situation, and he said, "I have to tell you the truth. And 1 day I have to give an account to God and not to nobody else about what I have done in my life. And that is why I have said and shared the stuff that I wouldn't like to share with you all." Mr. Pettitte's consistent honesty makes him a role model on and off the field.

And finally, based on the information that Brian McNamee provided, Senator Mitchell reported that Roger Clemens used human growth hormone and steroids. Brian McNamee told Senator Mitchell that on over 20 occasions he injected Roger Clemens with either human growth hormone or steroids.

All of us from time to time can have memory lapses. If any of us were asked to recall a specific incident or event that occurred 10 years ago, we might get the substance right, but we would be off on some details. I think most of us can relate to that. It is rare, however, to have the situation the committee faces today.

Mr. Clemens and Mr. McNamee have both cooperated fully with us, and both have given us sworn statements. They both insist that they are telling the truth. But their accounts couldn't be more different. They don't disagree on a phone call or one meeting. They disagree on whether, over a period of 4 years, Mr. McNamee repeatedly injected Mr. Clemens with steroids and human growth hormone.

It is impossible to believe that this is a simple misunderstanding. Someone isn't telling the truth. If Mr. McNamee is lying, then he has acted inexcusably and he has made Mr. Clemens an innocent victim. If Mr. Clemens isn't telling the truth, then he has acted shamefully and has smeared Mr. McNamee. I don't think there is anything in between.

After we had completed our depositions, my intent was to cancel this hearing and issue a written report. We have learned a lot about Mr. McNamee's allegations and Mr. Clemens's account, and I thought a bipartisan report setting out the facts with Mr. Davis might be the most effective way to present the results of our investigation.

But others had different views, and I was particularly influenced by the view of Mr. Clemens' attorneys, who thought it would be unfair if the committee issued a report without giving Mr. Clemens the opportunity to testify in public. So I decided to proceed with this hearing, which I expect will be the last hearing this committee will have on baseball's past or the Mitchell Report.

In today's hearing, Mr. McNamee's credibility will be bolstered by the testimony the committee received from Mr. Knoblauch and Mr. Pettitte in their depositions. Mr. McNamee named three play-

# Exhibit B

HENRY A. WAXMAN, CALIFORNIA
CHAIRMAN

TOM LANTOS, CALIFORNIA
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
BRIAN HIGGINS, NEW YORK
JOHN A. YARMUTH, KENTUCKY
BRUCE L. BRALEY, IOWA
ELEANOR HOLMES NORTON,
  DISTRICT OF COLUMBIA
BETTY McCOLLUM, MINNESOTA
JIM COOPER, TENNESSEE
CHRIS VAN HOLLEN, MARYLAND
PAUL W. HODES, NEW HAMPSHIRE
CHRISTOPHER S. MURPHY, CONNECTICUT
JOHN P. SARBANES, MARYLAND
PETER WELCH, VERMONT

ONE HUNDRED TENTH CONGRESS

## Congress of the United States

### House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY (202) 225-5051
FACSIMILE (202) 225-4784
MINORITY (202) 225-5074

www.oversight.house.gov

TOM DAVIS, VIRGINIA,
RANKING MINORITY MEMBER

DAN BURTON, INDIANA
CHRISTOPHER SHAYS, CONNECTICUT
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
MARK E. SOUDER, INDIANA
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
MICHAEL R. TURNER, OHIO
DARRELL E. ISSA, CALIFORNIA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
VIRGINIA FOXX, NORTH CAROLINA
BRIAN P. BILBRAY, CALIFORNIA
BILL SALI, IDAHO
JIM JORDAN, OHIO

February 27, 2008

The Honorable Michael B. Mukasey
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dear Mr. Attorney General:

We are writing to ask the Justice Department to investigate whether former professional baseball player Roger Clemens committed perjury and made knowingly false statements during the Oversight and Government Reform Committee's investigation of the use of steroids and performance-enhancing drugs in professional baseball.

We believe that his testimony in a sworn deposition on February 5, 2008, and at a hearing on February 13, 2008, that he never used anabolic steroids or human growth hormone, warrants further investigation. That testimony is directly contradicted by the sworn testimony of Brian McNamee, who testified that he personally injected Mr. Clemens with anabolic steroids and human growth hormone. Mr. Clemens's testimony is also contradicted by the sworn deposition testimony and affidavit submitted to the Committee by Andrew Pettitte, a former teammate of Mr. Clemens, whose testimony and affidavit reported that Mr. Clemens had admitted to him in 1999 or 2000 that he had taken human growth hormone.

Mr. Pettitte's testimony and affidavit further reported on two past conversations with Mr. McNamee that support Mr. Pettitte's recollection of the 1999 or 2000 conversation with Mr. Clemens. Mr. Pettitte's affidavit and testimony state that in a conversation with Mr. McNamee shortly after Mr. Clemens alleged admission to Mr. Pettitte, Mr. McNamee became angry when Mr. Pettitte told him that he knew that Roger Clemens had used human growth hormone because that was supposed to be confidential. According to Mr. Pettitte's deposition, he also had another conversation with Mr. McNamee in 2003 or 2004 in which Mr. McNamee told him that he had obtained steroids for Mr. Clemens. Independently, in his deposition, Mr. McNamee recalled two conversations with Mr. Pettitte, one that could have occurred in 2000 and one in 2004, about Mr. Clemens's HGH and steroid use that were similar in substance to the two conversations described by Mr. Pettitte.

The Honorable Michael B. Mukasey
February 27, 2008
Page 2

Other evidence in the record before the Committee may be relevant to an investigation into the truthfulness of Mr. Clemens's assertions. That evidence relates to whether Brian McNamee injected Mr. Clemens with lidocaine in 1998; whether Mr. Clemens received pain injections from trainers on all four of his major league teams; whether he regularly received vitamin B-12 injections from team doctors and trainers; whether he ever talked with Mr. McNamee about human growth hormone; whether he was at Jose Canseco's home in Florida during the period June 8 to June 10, 1998; and whether he ever received notice that Senator George Mitchell asked to meet with him in connection with Senator Mitchell's independent investigation of the illegal use of steroids and other performance-enhancing drugs in Major League Baseball. We also understand that federal law enforcement officials may have access to additional evidence on these matters.

Under 18 U.S.C. § 1621, a witness commits perjury if the witness "willfully" asserts "any material matter which he does not believe to be true" after "having taken an oath" to "testify ... truly." Under 18 U.S.C. § 1001, a witness commits a crime if the witness "knowingly and willfully" makes "any materially false, fictitious, or fraudulent statement or representation" with respect to "any investigation or review, conducted pursuant to the authority of any committee ... of the Congress."

Congress cannot perform its oversight function if witnesses who appear before its committees do not provide truthful testimony. Perjury and false statements before Congress are crimes that undermine the integrity of congressional inquiries. For these reasons, we take evidence that a witness may have intentionally misled the Committee extremely seriously.

We are not in a position to reach a definitive judgment as to whether Mr. Clemens lied to the Committee. Our only conclusion is that significant questions have been raised about Mr. Clemens's truthfulness and that further investigation by the Department of Justice is warranted. We ask that you initiate such an investigation. The record of the Committee's proceedings will be made available to the Department of Justice to assist in the investigation.

Thank you for your assistance.

Sincerely,

Henry A. Waxman
Chairman

Tom Davis
Ranking Minority Member

# Exhibit C

# Obama's new Attorney General sitting out Roger Clemens' steroid probe

BY MICHAEL O'KEEFFE AND NATHANIEL VINTON
DAILY NEWS SPORTS WRITER

Tuesday. March 10th 2009  4:41 PM

Attorney General Eric Holder has recused himself from legal matters involving Roger Clemens, presumably because of a conflict of interest arising from Holder's law firm having represented Clemens during last year's congressional steroids probe, the Daily News learned Tuesday.

Prior to his appointment, Holder was a partner at Covington and Burling, the prestigious D.C. firm that was home to the Rocket's Washington attorney Lanny Breuer, who has himself been nominated for a top Justice Department post.

Sen. Charles E. Schumer (D-N.Y.), a member of the Senate Judiciary Committee, told The News last night that he expected Breuer to follow Holder's lead if Breuer is confirmed.

"He should, and I'm sure he will, recuse himself on anything having to do with Clemens," Schumer said

Breuer is now President Obama's nominee for assistant attorney general for the Department of Justice's criminal division, which would make him the supervisor of any federal prosecutor charging Clemens with perjury.

A grand jury is now convened to consider such charges, and witnesses have been asked to make Tuesdays and Thursdays available for testifying.

According to a friend of Clemens, the pitcher expects to be indicted. Federal law enforcement agents have been investigating him for more than a year.

Breuer was particularly aggressive in attacking the credibility of Clemens' accuser Brian McNamee, who has cooperated with several federal prosecutors, including Dan Butler, who is supervising the sitting grand jury.

In February of 2008 he said that McNamee, the pitcher's former trainer, was a "troubled man" who "apparently has manufactured evidence" to bolster his accusations.

Holder's recusal from the Clemens matter would seem to signal that Breuer, if confirmed, would also need to sit out any decision-making involving the perjury probe.

Clemens' name came up Tuesday as Breuer faced members of the Senate Judiciary panel in a confirmation hearing, but he was not asked directly about a conflict.

Breuer did not respond Tuesday to phone calls seeking comment.

In addition to perjury, questions have been raised about whether Clemens may have tampered with a witness when he spoke to Lily Strain, the former nanny of his children, before the House Committee on Oversight and Government had a chance to do so. The committee had been trying to reach her, and had asked for help from the Clemens legal team.

"Absolutely not!" Clemens' attorney Rusty Hardin said Tuesday when asked if he was concerned such charges could arise. "That was one of (committee chairman Henry) Waxman's most outrageous suggestions in the whole circus. It didn't happen and any impartial investigation would so show."

Breuer's comments about "manufactured evidence" were in reference to bloody syringes and medical waste that McNamee turned over to the government a month before the hearings, claiming he had saved them years earlier in a FedEx box because of suspicions about Clemens.

Last January and February, Breuer worked closely with Hardin in an attempt to discredit McNamee. Neither attorney came out of the congressional steroids probe looking pretty - and not just because their client was referred to the DOJ for perjury.

In one of the most dramatic episodes of the Feb. 13, 2008, hearing, Breuer stood and put his hand on Clemens' shoulder while defending his client (and himself) from what Breuer called "innuendo" about witness tampering.

The "innuendo" came from Waxman (D.-Calif.), who claimed to be "troubled" that Clemens and his legal team had met with and spoken to Strain, the former nanny who McNamee had said was present at a party that Clemens swore he hadn't attended.

"Was it your idea to meet with her before forwarding her name to us or did someone suggest that to you?" Waxman asked Clemens.

Breuer also frustrated the committee with his long delay in sharing with the panel a portion of Clemens' medical records that related to an abscess on the pitcher's backside.

That injury allegedly was the result of a botched injection - probably of vitamin B12, according to Clemens, or of the steroid Winstrol, according to a radiology specialist the committee consulted with upon finally receiving the records just before the hearing