# EXHIBIT  B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

-----------------------------------------------------------------x

WILLIAM ROGER CLEMENS,

Plaintiff,

-against-

BRIAN McNAMEE,

Defendant.

-----------------------------------------------------------------x

4:08-cv-000471
Judge Keith P. Ellison

**DEFENDANT'S OPPOSED MOTION TO DISQUALIFY RUSTY HARDIN, ESQ. AND RUSTY HARDIN & ASSOCIATES, P.C.**

Richard D. Emery
Debra L. Greenberger
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
*Admitted pro hac vice*

Earl Ward
75 Rockefeller Plaza, 20th Floor
New York, NY
*Admitted pro hac vice*

David R. Miller
David R. Miller, Attorney at Law, PLLC
Attorney at Law
2777 Allen Parkway, 7th Floor
Houston, Texas 77019

*Counsel for Defendant*

## NATURE AND STAGE OF THE PROCEEDINGS

This is a case of alleged defamation. Roger Clemens filed his Complaint against Brian McNamee in the 129th Judicial District Court of Harris County Texas on January 6, 2008. On February 11, 2008, Mr. McNamee timely and properly removed this action to this Court, on the basis of diversity of citizenship. On March 4, 2008, Defendant moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), and 12(b)(6). Concurrently, Defendant submits this memorandum of law and the Declaration of Richard D. Emery dated March 4, 2008 ("Emery Decl.") in support of Defendant's opposed motion to disqualify Rusty Hardin, Esq. and Rusty Hardin & Associates, P.C.[1]

## ISSUE, STANDARD AND SUMMARY OF ARGUMENT

(1) Should Rusty Hardin, Esq. and his law firm, Rusty Hardin & Associates, P.C., counsel for Roger Clemens, be disqualified?

- Standard: "A party seeking to disqualify opposing counsel on the ground of a former representation must establish two elements: 1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and 2) a substantial relationship between the subject matter of the former and present representations." *In re Am. Airlines, Inc.*, 972 F.2d 605, 615 (5th Cir. 1992) (internal quotation marks omitted).

- Mr. Hardin and his firm should be disqualified because Mr. Hardin represented Andy Pettitte in this same matter. Because Mr. Pettitte's testimony will be adverse to Mr. Clemens (assuming this case goes forward) and essential for Mr. McNamee's defense, Mr. Hardin's continuing representation presents a conflict of interest. Mr. Pettitte will not waive his attorney-client privilege with his former counsel, Mr. Hardin.

## BACKGROUND

Defendant, Brian McNamee, trained Major League Baseball players, including Roger Clemens and Andy Pettitte. As detailed further in the "Background" section of the Defendant's Motion to Dismiss (filed this same day), this case arises from Mr. McNamee's statement to federal

[1] By bringing this motion, Defendant in no way accedes to the jurisdiction of this Court as set forth in its Motion to Dismiss filed this same day.

investigators, and through the federal investigators, to Senator Mitchell, that he injected Mr. Clemens with steroids and Human Growth Hormone (HGH) and injected Mr. Pettitte with HGH. *See* Def. Mot. to Dismiss at 3-5.

On December 5, 2007, eight days before Senator Mitchell issued his report, Mr. McNamee contacted an employee of the agent for both Mr. Clemens and Mr. Pettitte to inform them that they would be named in the report. *See* Transcript of McNamee and Jimmy Murray, Dec. 5, 2007, at 2, attached as Exhibit E to Emery Decl. ("Ex. E").[2] Mr. Clemens and Mr. Pettitte retained Rusty Hardin's law firm which, purporting to represent both Mr. Clemens and Mr. Pettitte, immediately sent two investigators to question Mr. McNamee. These investigators, Jim Yarbrough and Billy Belk, are employed by Mr. Hardin's law firm. *See* Transcript of Interview of McNamee by Investigators, Dec. 12, 2007, at 8, Ex. F. They arrived with two separate signed letters, one from Mr. Clemens and one from Mr. Pettitte, each stating: "This is to confirm that Jim Yarbrough and Billy Belk work for the law firm that represents me." *See* Ex. D; *see also* Emery Decl. ¶ 3 ("[Pettitte's counsel] confirmed that Mr. Hardin formerly represented Mr. Pettitte with respect to the allegations relating to Mr. Pettitte which were raised in the Mitchell Report."). These letters are date-stamped December 11, 2007. Ex. D.

On December 13, 2007, the Mitchell Report was released. On December 15, 2007, Mr. Pettitte released a statement through his agents admitting that Mr. McNamee's statements were true and he had used HGH. *See, e.g.*, *Pettitte Admits Using HGH Twice in 2002*, Wash. Post, Dec. 16, 2007, at D8, Ex. J. Shortly afterwards, Mr. Hardin terminated his representation of Mr. Pettitte. Emery Decl. ¶ 5. By that time, however, Mr. Hardin and his associates had engaged in privileged conversations with Mr. Pettitte outside Mr. Clemens's presence pursuant to Mr. Pettitte's retention of

---

[2] All exhibits referenced in this brief are attachments to the Emery Declaration.

Mr. Hardin as counsel for representation in matters relating to the Mitchell Report.[3] Emery Decl. ¶¶ 3, 4.

Thereafter, Mr. Hardin, representing the interests of Mr. Clemens only, immediately decried Mr. Clemens's innocence in the press and attacked Mr. McNamee as a "troubled man." *See, e.g.*, Tim Cowlishaw, *Roger Clemens' Reputation Takes a Hit*, Dallas Morning News, Dec. 13, 2007, Ex. K. Mr. Hardin also made several statements to the press about Mr. Pettitte: "Hardin said that Clemens was not concerned about sharing a table with either Knoblauch or Pettitte. 'One, Roger never took steroids,' Hardin said. 'Two, I have no reason to believe they won't tell the truth about Roger.'" Alan Schwarz, *From Same Dugout to the Same Row Before Congress*, N.Y. Times, Jan. 9, 2008, at D1, Ex. L. Mr. Hardin later told the press, "We have nothing to fear about what Andy [Pettitte] may testify to." Ben DuBose, *Clemens, under oath, talks to Congress*, L.A. times, Feb. 6, 2008, Ex. M.

On February 4, 2008, Mr. Pettitte was deposed by staff members of the House Committee on Oversight and Government Reform ("Committee"). *See* Deposition of Andrew Pettitte at 1-3, Ex. B. By that point he was represented by new counsel. *Id.* In conjunction with the Congressional investigation, Mr. Pettitte submitted an affidavit dated February 8, 2008 to the House Committee on Oversight and Government Reform, Ex. A, in which he stated:

- "In 1999 or 2000, I had a conversation with Roger Clemens in which Roger told me that he had taken human growth hormone ("HGH"). This conversation occurred at his gym in

[3] Certainly, given Mr. Pettitte's immediate acknowledgement of his use of HGH and his later testimony (see below) that Mr. Clemens told him that he – Mr. Clemens – had used HGH, it is reasonable to assume that Mr. Pettitte revealed this knowledge to Mr. Hardin during these privileged conversations. However, as discussed below, this assumption is unnecessary given the irrebuttable presumption of privileged attorney-client communications.

Memorial, Texas. He did not tell me where he got the HGH or from whom, but he did tell me that it helped the body recover." Ex. A ¶ 1.

- "Shortly after my conversation with Roger, I spoke with Brian McNamee. Only he and I were parties to the conversation. I asked Brian about HGH and told him that Roger said he had used it. Brian McNamee became angry. He told me that Roger should not have told me about his HGH use because it was supposed to be confidential. While I don't remember if Brian told me that he supplied Roger with HGH, it certainly was my impression from the conversation that he did." Ex. A ¶ 3. *See also* Ex. B at 32-33 (Q: Do you have "any reason to think [Mr. McNamee] wasn't being straight with you about [Roger's use]"? Pettitte: "No. I mean, I would — I had no reason to think that. No.").

- "In 2005, around the time of the Congressional hearings into the use of performance enhancing drugs in baseball, I had a conversation with Roger Clemens in Kissimmee, Florida. I asked him what he would say if asked by reporters if he ever used performance enhancing drugs. When he asked me what I meant, I reminded him that he had told me that he used HGH. Roger responded by telling me that I must have misunderstood him; he claimed that he told me that it was his wife, Debbie, who used HGH. I said, 'Oh, okay,' or words to that effect, not because I agreed, but because I wasn't going to argue with him." Ex. A ¶ 4-6.

When confronted with Mr. Pettitte's testimony at the Congressional hearing on February 13, 2008, Mr. Clemens stated: "I believe Andy has misheard, Mr. Congressman, on his comments about myself using HGH, which never happened." *Preliminary Transcript: The Mitchell Report: The Illegal Use Of Steroids In Major League Baseball, Day 2,* House of Representatives, Committee on Oversight and Government Reform (Feb. 13, 2008), at 37, Ex. C. He further stated,

"I think he misremembers." *Id.* at 42. Mr. Pettitte submitted his affidavit under penalty of perjury, Ex. A, and when asked in his Congressional deposition whether he had any "doubt about that recollection" of the 1999 or 2000 conversation, Mr. Pettitte said, "I mean, no. I mean, he told me that." Ex. B at 98.

To date, Mr. Hardin and his law firm continue to represent Mr. Clemens.

**ANALYSIS**

Rusty Hardin and his law firm cannot represent Mr. Clemens in this case because, in this same matter, they formerly represented a central witness, Mr. Pettitte, whose testimony provides direct proof of the truth of Mr. McNamee's allegedly defamatory statements.

In Texas,

> [w]ithout prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client: (1) in which such other person questions the validity of the lawyer's services or work product for the former client; (2) if the representation in reasonable probability will involve a violation of Rule 1.05 [confidentiality of client information]; or (3) if it is the same or a substantially related matter.[4]

Tex. Disciplinary Rules of Prof'l Conduct § 1.09(a), Ex. G (governing conflicts of interests with former clients). This rule "on its face forbids a lawyer to appear against a former client if the current representation in reasonable probability will involve the use of confidential information *or* if the current matter is substantially related to the matters in which the lawyer has represented the former client." *In re Am. Airlines, Inc.*, 972 F.2d 605, 615 (5th Cir. 1992) (emphasis in original and internal quotation marks omitted).

---

[4] Similarly, the American Bar Association Model Rules of Professional Conduct ("ABA Model Rules"), Rule 1.9(a), Ex. H, provides with regard to "Duties to Former Clients": "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."

In considering a disqualification motion, this Court should examine "whether a conflict has (1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety will occur, and (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case." *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 266 (5th 2001). Courts consider the Texas Disciplinary Rules of Professional Conduct (which were adopted by the Texas federal courts) along with "the ethical canons contained in the ABA Model Code." *In re Am. Airlines, Inc.*, 972 F.2d at 610 (internal quotation marks omitted).

The party seeking disqualification bears the burden of proving that the present and prior representations are substantially related, *id.* at 614, however, "any doubts as to the propriety of an attorney's appearing in a case shall be resolve in favor of disqualification," *United States v. Aleman*, No. 04-1509, 2004 WL 1834602, at *1 (W.D. Tex. Aug. 12, 2004).

**I. MR. HARDIN AND HIS FIRM MUST BE DISQUALIFIED, AS HIS FORMER CLIENT IN THIS SAME MATTER WAS ANDY PETTITTE, AND MR. CLEMENS'S INTEREST ARE ADVERSE TO MR. PETTITTE'S**

"A party seeking to disqualify opposing counsel on the ground of a former representation must establish two elements: 1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and 2) a substantial relationship between the subject matter of the former and present representations." *In re Am. Airlines, Inc.*, 972 F.2d at 6154 There is an "*irrebuttable* presumption . . . that relevant confidential information was disclosed during the former period of representation" if the substantial relationship test is met. *Id.* (internal quotation marks omitted and emphasis added). Moreover, the moving party "is not required to point to specific confidences revealed" to succeed on its disqualification motion. *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1028 (5th Cir. 1981).

Here, there is no doubt that Mr. Pettitte and Mr. Hardin had an attorney client relationship. *See* Emery Decl. ¶ 3. Nor is much analysis necessary to determine that there is a "substantial relationship" between the matters in the pending suit and the subject matter of the previous representation, as this is the very same matter, responding to Mr. McNamee's allegations in the Mitchell Report about steroid and HGH use in Major League Baseball. *Id.* Thus, continuing to represent Mr. Clemens would violate Mr. Hardin's duty of loyalty to Mr. Pettitte. Additionally, there is an irrebutable presumption that confidences would be disclosed. While this conflict may be waivable, Mr. Pettitte's counsel has informed Defendant's counsel that Mr. Pettitte will not waive his attorney-client privilege with his former counsel, Mr. Hardin. Emery Decl. ¶ 6.

Furthermore, this is not merely a hypothetical conflict. First, were this case to survive the pending motion to dismiss (or were a case brought in New York) Mr. Pettitte will undoubtedly be deposed and ultimately testify at trial. Other than the parties themselves, Mr. Pettitte will be the chief witness in this case. His testimony that Mr. Clemens admitted using HGH provides direct proof of the truth of Mr. McNamee's allegedly defamatory statements, an absolute defense to Mr. Clemens's claim.

Second, while it is not the movant's burden to demonstrate more than a significant relationship between the pending suit and the subject matter of the previous representation, movant notes that Mr. Hardin's continuing representation of Mr. Clemens violates his duty of loyalty to his former client. Simply put, it cannot be the case that both Mr. Clemens and Mr. Pettitte are truthful. Thus, to successfully prosecute Mr. Clemens's claim, and consistent with his duty of loyalty to Mr. Clemens, Mr. Hardin would be obligated to disclose confidential information about Mr. Pettitte to undermine Mr. Pettitte's credibility. Even if Mr. Hardin chose not to rely on confidential information, his duty to Mr. Clemens dictates that he must seek to discredit Mr. Pettitte in order to

demonstrate that he is "misremembering" or lying. In the alternative, if Mr. Hardin is to respect his duty to his former client Mr. Pettitte, he will have to avoid using confidential information and avoid attacking Mr. Pettitte's credibility. Thus, if he respects his obligations to Mr. Pettitte, he violates his duty to Mr. Clemens. In undertaking either of these tacks, Mr. Hardin therefore must violate either his duty to Mr. Pettitte or Mr. Clemens.

Courts and commentators agree that disqualification is appropriate where counsel would be in the position of cross-examining a former client whose testimony is adverse to a current client. The Comments in the ABA Model Rules address this very circumstance, explaining that "a directly adverse conflict may arise when a lawyer is required to cross-examine a client who appears as a witness in a lawsuit involving another client, as when the testimony will be damaging to the client who is represented in the lawsuit." "General Principles," Cmt. 6 to Rule 1.7 of the ABA Model Rules, Ex. I.

Courts routinely grant disqualification in such circumstances. For example, in *Pyle v. Meritor Savings Bank*, No. 92-7361, 92-7362, 1994 WL 156707, at *1 (E.D. Pa. Apr. 26, 1994), two employees, Pyle and Shute, both represented by the law firm of SPG, brought suit against their employer. In the course of the suit Shute withdrew his claim and testified in an affidavit that Pyle had lied in his deposition. *Id.* The court granted defendants' motion to disqualify SPG, Shute's former counsel, from representing Pyle because Shute "will be a key witness for the defense." *Id.* The court laid out the "divided loyalties" inherent with allowing SPG to cross-examine Shute:

> The conflicts presented in successive representation cases in which a former client has become an adverse witness may arise in a variety of ways. First, during the cross-examination of a former client the attorney may be tempted to violate the privilege and use information learned in the confidential communications between him and the witness to benefit the defendants. Second, counsel may hesitate to conduct a rigorous cross-examination of a former client for fear of breaching the confidential relationship. Third, the attorney's

> pecuniary interest in the future business of the witness may cause him to avoid trial tactics which, while beneficial to the defendant, may prejudice the former client.

*Id.* (quoting *United States v. Esposito*, 816 F.2d 674, 1987 WL 37105 (4th Cir.1987) (unpublished disposition)). The court concluded by stating: "In light of these potential conflicts, it is no wonder that courts have consistently held that it is proper to disqualify counsel in instances where counsel will be required to cross-examine a former witness." *Id.* at *2. Similarly, in *Bobkoski v. Bd. of Educ.*, No 90-5737, 1991 WL 61052 (N.D. Ill. April 12, 1991), the Court disqualified an attorney who was representing the school board in an age-discrimination case, where that attorney had represented another teacher who had filed an age discrimination case against the school board. The Court explained that disqualification was necessary — despite the fact that the former representation took place while the attorney was employed by a different firm, and despite the fact that other attorneys did most of the work in the case — as the former client was now a "potential witness." *Id. at* *1.[5]

If this Court were to find that Mr. Hardin is disqualified from representing Mr. Clemens in this matter, it must also disqualify his entire firm. Texas Rule 1.09(b), which governs conflicts of interests with former clients, clearly states: "Except to the extent authorized by Rule 1.10

---

[5] *See also Narel Apparel Ltd., Inc. v. Am. Utex Intern.*, 92 A.D.2d 913, 914 (N.Y. App. Div. 1983) (disqualifying plaintiff's attorney as "[t]he fact that its attorney had been in a position to learn confidential information concerning defendants' witnesses would afford plaintiff an unfair advantage" and "attorney should not be permitted to put himself in a position where, even unconsciously he will be tempted to 'soft pedal' his zeal in furthering the interests of one client in order to avoid an obvious clash with those of another" (internal quotation marks omitted)); *Balda v. Sorchych*, 616 So.2d 1114, 1115 (Fla. Dist. Ct. App. 1993) (granting disqualification and recognizing that "conflict concerns arise when an attorney must prepare a case against, cross-examine or impeach a former client on a subject matter so closely connected with the earlier representation that confidentiality might be involved"); *C.T. v. Liberal Sch. Dist.*, Nos. 06-2093, 06-2360, 06-2359, 2007 WL 773717, at *4 (D.Kan. Mar. 9, 2007) (noting that out of concern for an "appearance of impropriety" and wishing "to avoid any further potential breach of professional ethics" disqualification before the relevant depositions occurred was the court's "own ethical duty to head off any potential breach of professional ethics"); *Louth v. Wiegand*, 167 A.D.2d 850, 850 (N.Y. App. Div. 1990) (stating that conflict of interest exists where firm client would face cross-examination by his own lawyer's despite client's waiver, because due to "attorney's loyalty to a client of the firm, the attorney may not engage in a vigorous cross-examination of the client").

[involving government attorneys], when lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so by paragraph (a)." Ex. G.

Mr. Hardin should be disqualified from this case as there is an undeniable conflict where Mr. Pettitte, a former client in this same matter, will be an essential witness, and his testimony will be adverse to Mr. Clemens.

## II. DEFENDANT HAS STANDING TO SEEK COUNSEL'S DISQUALIFICATION.

Under Fifth Circuit precedent, Mr. McNamee has "standing to seek disqualification even though [he] is not an aggrieved client because [his] attorneys are authorized to report any ethical violations committed in the case." *Brown & Williamson Tobacco Corp. v. Daniel Intern. Corp.*, 563 F.2d 671, 673 (5th Cir. 1977). In addition, Mr. Pettitte has indicated that he will not waive the attorney-client privilege. Emery Decl. ¶ 6.

In *In re Gopman*, 531 F.2d 262, 265-66 (5th Cir. 1976), the Court held that where a disqualification was based on the contention that counsel "had violated the ethical canons" by "representing parties with adverse interests," the attorney who discovers the "possible ethical violation concerning a matter before a court . . . is not only authorized but is in fact obligated to bring the problem to that court's attention." *Id.* Furthermore, trial judges have "jurisdiction to act upon this claim of unethical conduct" as "lawyers are officers of the court" and "courts have the inherent authority to regulate their professional conduct." *Id.*

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that Mr. McNamee's motion to Mr. Hardin and his law firm, Rusty Hardin & Associates, P.C., should be granted.

**CERTIFICATE OF CONFERENCE**

Plaintiff's co-counsel, David Miller Esq., David R. Miller, Attorney at Law, PLLC conferred with Joe Roden Esq., Rusty Hardin & Associates, P.C., Mr. Clemens's counsel, on March 4, 2008. Mr. Roden stated that he opposed this motion.

Date: March 4, 2008
New York, NY

Respectfully Submitted,

s/

Richard D. Emery
Debra L. Greenberger
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Telephone (212) 763-5000
Fax (212) 763-5001
Admitted *pro hac vice*

s/

Earl Ward
75 Rockefeller Plaza. 20th Floor
New York, NY 10019
Telephone (212) 763-5000
Fax (212) 763-5001
Admitted *pro hac vice*

s/

David R. Miller, Attorney at Law, PLLC
Federal ID No. 7066, State Bar No. 14067500
2777 Allen Parkway, 7th Floor
Houston, Texas 77019
Telephone: (713) 579-1568
Fax: (713) 579-1528

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of March 2008, a true and correct copy of the foregoing instrument was served upon all counsel of record in accordance with the Federal Rules of Civil Procedure, *to-wit*:

Rusty Hardin
Derek Hollingsworth
Andy Drumheller
Joe Roden
Terry Kernell
Rusty Hardin & Associates, P.C.
1401 McKinney, Suite 2250
Houston, Texas 77010
(713) 652-9000
(713) 652-9800 (facsimile)

s/
Debra L. Greenberger

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

---------------------------------------------------------------x

WILLIAM ROGER CLEMENS,

Plaintiff,

4:08-cv-000471
Judge Keith P. Ellison

-against-

BRIAN McNAMEE,

Defendant.

---------------------------------------------------------------x

**DECLARATION OF RICHARD D. EMERY IN SUPPORT OF DEFENDANT'S OPPOSED MOTION TO DISQUALIFY RUSTY HARDIN, ESQ. AND RUSTY HARDIN & ASSOCIATES, P.C.**

RICHARD D. EMERY declares, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a partner at the firm of Emery Celli Brinckerhoff & Abady LLP, attorneys for Defendant Brian McNamee. I submit this declaration in support of Defendant's motion for disqualification of Rusty Hardin, Esq., and his law firm.

2. I spoke today to co-counsel for Andy Pettitte, Thomas J. Farrell, a partner at the law firm of Dreier LLP. Mr. Pettitte is also represented by Jay K. Reisinger of Dreier and James E. Sharp of Sharp & Associates.

3. Mr. Farrell confirmed that Mr. Hardin formerly represented Mr. Pettitte with respect to the allegations relating to Mr. Pettitte which were raised in the Mitchell Report.

4. According to Mr. Farrell, during the course of that representation, Mr. Hardin conferred with Mr. Pettitte in legally privileged conversations outside the presence of Mr. Clemens.

5. Mr. Farrell further stated that Mr. Hardin's representation of Mr. Pettitte terminated shortly after Mr. Pettitte released a statement confirming the allegations in the Mitchell Report that he had used human growth hormone over a two-day period.

6. Mr. Farrell further stated that Mr. Pettitte will not waive any attorney-client privilege that attaches to Mr. Hardin's former representation of Mr. Pettitte.

7. Attached hereto as Exhibit A is a true and complete copy of the Affidavit of Andy Pettitte dated February 8, 2008, submitted to the House Committee on Oversight and Government Reform ("Committee").

8. Attached hereto as Exhibit B is a true and complete copy of excerpts of the Deposition of Andrew Pettitte, taken by the staff members of the Committee, dated February 4, 2008.

9. Attached hereto as Exhibit C is a true and complete copy of excerpts of Day 2 of the Committee's hearing regarding the Mitchell Report, dated February 13, 2008.

10. Attached hereto as Exhibit D is a true and complete copy of letters received by Brian McNamee evidencing that both Mr. Clemens and Mr. Pettitte were represented by Mr. Hardin's law firm on December 11, 2007.

11. Attached hereto as Exhibit E is a true and complete copy of the transcript from a telephone conversation between Brian McNamee and Jimmy Murray on December 5, 2007.

12. Attached hereto as Exhibit F is a true and complete copy of an excerpt from the interview of Brian McNamee by Jim Yarbrough and John "Billy" Belk on December 12, 2007.

13. Attached hereto as Exhibit G is a true and complete copy of Rule 1.09 of the Texas Disciplinary Rules of Professional Conduct.

14. Attached hereto as Exhibit H is a true and complete copy of Rule 1.9(a) of the ABA

Model Rules of Professional Conduct.

15. Attached hereto as Exhibit I is a true and complete copy of Rule 1.7 of the ABA Model Rules of Professional Conduct.

16. Attached hereto as Exhibit J is a true and complete copy of a December 16, 2007, Washington Post article, entitled *Pettitte Admits to Using HGH Twice in 2002*.

17. Attached hereto as Exhibit K is a true and complete copy of a December 13, 2007, Dallas Morning News article, entitled *Roger Clemens's Reputation Takes a Hit* by Tim Cowlishaw.

18. Attached hereto as Exhibit L is a true and complete copy of a January 9, 2008, New York Times article, entitled *From the Same Dugout to the Same Row Before Congress* by Alan Schwarz.

19. Attached hereto as Exhibit M is a true and complete copy of a February 6, 2008, Los Angeles Times article, entitled *Clemens, under oath, talks to Congress* by Ben DuBose.

20. I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: March 4, 2008
New York, New York

s/
Richard D. Emery (RE 5181)

Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Telephone (212) 763-5000
Fax (212) 763-5001
*Admitted pro hac vice*

*Counsel for Defendant*

Case 4:08-cv-00471 Document 21-2 Filed 03/04/2008 Page 54 of 64

# EXHIBIT F

*****************************************************

INTERVIEW OF BRIAN McNAMEE

DECEMBER 12, 2007

*****************************************************

INTERVIEWED BY: JIM YARBROUGH
JOHN "BILLY" BELK
RUSTY HARDIN & ASSOCIATES, P.C.
1401 McKinney, Suite 2250
Houston, Texas 77010
(713) 652.9000

1ebaf4d1-cd40-4f1a-b73e-5bc8ae678354

SPEAKER IDENTIFICATION:
JIM YARBROUGH - QUESTION
BRIAN McNAMEE - ANSWER
BILLY BELK - BILLY BELK
INTERVIEW OF BRIAN McNAMEE
DECEMBER 12, 2007

GPS SYSTEM: Approaching destination on the right.
BILLY BELK: (Background noise.) 8688 -- that's a Lexus right there.
GPS SYSTEM: You have arrived.
BILLY BELK: (Background noise.) That's probably his. There's a baseball cap in the back.
(Knock on door.)
JIM YARBROUGH: Hey, Brian, how are you doing?
BRIAN McNAMEE: Fine. How are you? (Inaudible - background noise.)
BILLY BELK: Billy Belk.
BRIAN McNAMEE: You're who?
BILLY BELK: Billy Belk.
BRIAN McNAMEE: How are you doing?
BILLY BELK: I'm doing all right. How are you doing?

BRIAN McNAMEE: I'm doing fine.
BILLY BELK: Now, is that water that way and this way, too? Is that kind of an island?
BRIAN McNAMEE: That's the canal and that's the Atlantic ocean.
BILLY BELK: It's not very wide, is it? How long does the island go?
BRIAN McNAMEE: It goes out to the (inaudible) which is further away from the canal and then the Hamptons. I don't know if you're familiar with the area south. The Hamptons is a big vacation spot.
JIM YARBROUGH: The Hamptons is close to here?
BRIAN McNAMEE: It's about 50 miles, just straight east. How was your -- how was your ride?
JIM YARBROUGH: Oh, it was actually pretty good. I went the wrong way when I came out of the airport. I went out and went to the right. I always have -- the GPS systems told me to turn (inaudible-background noise) --
BRIAN McNAMEE: Right.
JIM YARBROUGH: Anyway, we made a U-turn and got headed back the right way.
BRIAN McNAMEE: You're probably better off

renting a car.
JIM YARBROUGH: Yeah, yeah, it's a nice ride. Hey, Brian, can I use your rest room real quick?
BRIAN McNAMEE: Sure. Do you want water, soda -- the rest room is --
JIM YARBROUGH: I'll have some water.
BRIAN McNAMEE: I've got water, juice, milk, soda, beer, uh, Red Bull.
BILLY BELK: I'll take some water -- some bottled water. Jim was telling me that you were a former New York police officer?
BRIAN McNAMEE: Yeah, I was a New York City cop.
BILLY BELK: I was just retired from the Houston Police Department, October 6th.
BRIAN McNAMEE: Yeah, you know what, I always -- I always had a relationship with you guys. You must have had a pretty good time.
BILLY BELK: Yeah, I really did, 30 years with the department, and 25 of those 30 in the homicide division. And it just kind of kept us busy --
BRIAN McNAMEE: Yeah, my --
BILLY BELK: -- and kept a smile on a

face.
BRIAN McNAMEE: Was it busy?
BILLY BELK: Oh, God, yes.
BRIAN McNAMEE: Yeah.
BILLY BELK: We - in Houston, we had some of the most sensational murder cases in all the country. It seems like we'd always -- we always had them.
BRIAN McNAMEE: Yeah, the cop's service was good to me. And my father was an Italian inspector and then he went to work for the Feds. And then my brother-in-law was a first-grade -- he retired first-grade detective, which is the highest ranking detective in New York. And he was in the most glorified precinct, which is Midtown North; and he was in homicide. And I was in -- I left when I was -- when I was on the current (phonetic), which is on the cover --
BILLY BELK: Right.
BRIAN McNAMEE: -- street patrol, which is on the detective end, and that's when I -- I did that for a year before I got out.
BILLY BELK: How long were you on the department?
BRIAN McNAMEE: Three-and-a-half years,

1ebaf4d1-cd40-4f1a-b73e-5bc8ae676354

# B.M. Interview - 12-12-2007

BILLY BELK: Three-and-a-half?
BRIAN McNAMEE: Yeah.
INTERVIEW BY JIM YARBROUGH:
Q. When was that, Brian? What years were you --
A. '90 to '93.
Q. '90 to '93?
A. Yeah. So, let's -- what are you guys doing? What are you trying to accomplish? And the only thing I can tell you is: I'm trying to help --
Q. Right.
A. -- the people that employ you --
Q. Right.
A. -- without -- now, the only thing this can do, is hurt me; because it can't hurt Roger and Andy. It can't hurt you guys. I mean, this is only going to hurt me.
Q. And how do you -- how do you --
A. So --
Q. -- how do think it would hurt you?
A. No, I'm just saying, if -- my -- by me doing this, if it got out --
Q. Oh --
A. -- or if it's found out, my point is: This can only stay the same or help Roger and Andy. This can't help me and it can only hurt me. So as far as

you guys, you know that, I'm not going to -- I mean, obviously, I told you guys to come here because I want to help them.
Uhm -- my attorney's been calling and calling and calling. The media's been calling. I can show the -- I can show you message after message from the media calling me. I was in the paper today, the Daily News -- uhm -- so with that said, I just -- I want to know: What are you guys trying to accomplish so, maybe, we don't have to go through a whole --
Q. Yeah.
A. -- pedigree of stuff. But tell me what your goal is. I mean --
Q. Well --
A. -- I heard you.
Q. And I'll -- and I'll try to be just as straight with you and upfront with you as I can, Brian. Our goal is simply on behalf of Roger and Andy to try to talk to you about the knowledge that you have concerning what may or may not come out in this Mitchell report.
A. I know exactly what's going to come out.
Q. Okay. Well, we don't.
BILLY BELK: We don't know, I mean,

that's the whole problem. It's like "Well, what's -- what are they going to say? What's coming out?"
A. But that's -- we can talk -- we can talk as cops --
Q. (BY JIM YARBROUGH) Yeah.
A. -- but that's what I was trying to accomplish.
Q. Yeah.
A. But I wanted -- I wanted you guys -- like, who are you going back to report to?
Q. We're going to go back and I'm going to report back to Rusty Hardin, who is the -- he's the guy that owns our law firm. It's a single partner firm. We've got about nine lawyers.
A. And this is -- this is you? All right.
Q. Yeah.
A. Okay.
Q. And Rusty represents Andy and Roger; and we were actually brought on board by Randy, their agent, Rusty was.
A. And Randy's not an attorney?
Q. Yeah, yeah.
A. So what they -- he outsourced this?
Q. Rusty's a --
A. He subbed it out? He subbed this out?
Q. Well, you've got to know -- I don't know if

you did any research on Rusty. Rusty's a pretty high profile attorney?
A. I don't have the net.
Q. Do what?
A. Tomorrow I get Internet service.
Q. Oh. He's a very high profile attorney, and I'll give you a little background on Rusty. Rusty's a former prosecutor with the Harris -- with Harris County District Attorney's Office. He was --
A. Where is Harris County?
Q. Houston.
BILLY BELK: Houston. It's the County Houston sits inside. And it's the District Attorney's Office, it's county government.
Q. (BY JIM YARBROUGH) So Rusty was -- it's a big -- it's a big office. There's -- there's over a hundred assistant -- assistant DA's there. Rusty was one of the top three guys in the DA's office when he left. I retired in 1991 with HPD.
Rusty retired -- or he left the DA's office about six months before I retired. And he started up a law firm with some other guys that worked in the DA's office and then eventually, a little bit later, he split off on his own.
A. Okay.

1ebaf4d1-cd40-4f1a-b73e-5bc8ae678354