UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
BRIAN G. McNAMEE,

                 Plaintiff,                        09 CV 1647 (SJ) (CLP)

                 v.                            MEMORANDUM
                                               AND ORDER

WILLIAM ROGER CLEMENS,

                 Defendant.

--------------------------------------------------X

A P P E A R A N C E S

EMERY CELLI BRINCKERHOFF & ABADY LLP
75 Rockefeller Plaza
20th Floor
New York, NY 10019
212-763-9000
By:    Earl Ward, Richard D. Emery, Debra L. Greenberger
*Attorneys for Plaintiff*

STEPTOE & JOHNSON LLP
750 Seventh Avenue
New York, NY 10019
212-506-3900
Email: eglassman@steptoe.com
By:    Evan Glassman, Joe M. Roden, Michael C. Miller
*Attorneys for Defendant*

JOHNSON, Senior District Judge:

        Plaintiff Brian G. McNamee ("Plaintiff" or "McNamee") has

brought the above-captioned action against Defendant William Roger Clemens

("Defendant" or "Clemens") alleging state and common law causes of action for

defamation, malicious prosecution, and intentional infliction of emotional distress, and seeking damages in excess of $75,000.

Presently before the Court is the Defendant's motion to dismiss the amended complaint filed by Plaintiff on July 31, 2009 ("Amended Complaint") for lack of personal jurisdiction and for failing to state a claim upon which relief can be granted. For the reasons set forth herein, Defendant's motion is GRANTED in part and DENIED in part.

## BACKGROUND

Roger Clemens is a former major league baseball ("MLB") player who was drafted by the Boston Red Sox in 1983 after playing baseball for the University of Texas. (Am. Compl. Ex. H ¶¶ 12-13). Clemens spent thirteen years with the Red Sox until he signed with the Toronto Blue Jays in 1997. (Am. Compl. Ex. A). As a member of the Blue Jays, Clemens met Brian McNamee, an athletic trainer for the Toronto organization, and began training with him in 1998. (Am. Compl. Ex. H ¶ 16). In 1999, Clemens was traded to the Yankees. One year later, reportedly at Clemens' urging, the Yankees hired McNamee as an assistant strength and conditioning coach. (Am. Compl. Ex. A). Clemens retired from the Yankees in 2003. In 2004, Clemens came out of his short-lived retirement and joined the Houston Astros for three seasons. In 2007, he signed a one-year contract with the

Yankees.  At present, Clemens is not a member of any professional baseball team.

Although Clemens reportedly stopped working with McNamee in 2001 when he

learned that McNamee was facing rape allegations in Florida, Clemens re-hired

McNamee after Clemens left the Yankees in 2003 and they continued to work

together in 2005, 2006, and 2007.  (Am. Compl. ¶ 10; Def. Mem. of Law in Supp.

Mot. to Dismiss ("Def. Mem of Law")

       10, n. 2).

       Clemens is not the average MLB player; with 354 career victories

and seven Cy Young Awards, Clemens is one of the most prominent pitchers in

baseball history.  (Am. Compl. Ex. A).  However, this storied reputation was called

into question after statements McNamee made accusing Clemens of steroid use

became public.  In the spring of 2007, federal authorities contacted McNamee in

New York City in connection with the Government's criminal investigation of

BALCO, a Bay Area laboratory allegedly involved in the development and sale of

performance-enhancing drugs.  (Am. Compl. ¶ 17).  At the interview, investigators

from the United States Attorney's Office for the Northern District of California told

McNamee that the Government had sufficient evidence to secure a conviction

against McNamee for delivering illegal performance-enhancing drugs to athletes.

In lieu of prosecution, McNamee was offered immunity for any statements he gave

in relation to the Government's investigation; however, McNamee would face

prosecution for perjury for any false statements he made.  (Id. at ¶18).  McNamee

told investigators that he injected Clemens with steroids and Human Growth Hormone ("HGH") during the 1998, 2000, and 2001 baseball seasons. (Am. Compl. ¶ 14, Ex. A; McNamee Decl. ¶ 12).

Specifically, McNamee told investigators that Clemens asked him about steroids around June 8-10, 1998. (Am. Compl. Ex. A). Later that summer, McNamee stated that Clemens asked to be injected with Winstrol, which Clemens provided. (Id.; Am. Compl. ¶ 13). McNamee told investigators that in 2000, after Clemens was traded to the Yankees and McNamee joined the New York team as a trainer, he injected Clemens four to six times with testosterone and H.G.H. (Id.). The next year, late in the 2001 season, McNamee said he injected Clemens at least four times with Sustanon or Deca-Durabolin, injectable steroids. (Id.). McNamee stated that the 2001 injections took place at Clemens' apartment in New York and the Yankees' Clubhouse, while others took place in Florida. (Am. Compl. at ¶ 15, Ex. F). According to McNamee, Clemens provided him with additional compensation to cover the cost of the performance enhancing drugs during 2000 and 2001. (McNamee Decl. ¶ 15).

A short time after his interview with the Government, federal authorities contacted McNamee again, this time requesting that he cooperate with an investigation being conducted by former United States Senator George Mitchell into the use of performance-enhancing drugs in the MLB (the "Mitchell Commission"). (Am. Compl. ¶ 19, Ex. B). On December 13, 2007, the Mitchell

Commission released the findings of its investigation in its *Report to the Commissioner of Baseball of an Independent Investigation Into the Illegal Use of Steroids and Other Performance Enhancing Substances By Players In Major League Baseball* (the "Mitchell Report"). (Am. Compl. ¶ 20). The Mitchell Report named 89 MLB players alleged to have used performance-enhancing drugs. (Id. at ¶ 21). Clemens was named in the Mitchell Report, which included McNamee's statements concerning Clemens' drug use. (Id.). In the Report, McNamee reiterated statements made to federal investigators that Clemens first asked McNamee to inject him with steroids in 1998. (Am. Compl. Ex. F). McNamee went on to tell Mitchell that after the initial request, he injected Clemens "approximately four times in the buttocks over a several week period" and that "[e]ach incident took place in Clemens' apartment in the Sky Dome." (Id.).

Clemens has publicly denied all allegations of drug use. (Am. Compl. ¶¶ 7, 25). His efforts to clear his name after the release of the Mitchell Report have been called a "verbal fastball," (Am. Compl. Ex. C), "a ferocious attack," (Am. Compl. Ex. K), and "a furious and, some say, debatable public relations effort with the spin of his tightest slider," (Am. Compl. Ex. I). In his attempt to clear his name, Clemens and his agents made a number of public statements regarding McNamee's accusations, including *inter alia*:

- December 27, 2007 – Clemens' taped a 60 Minutes interview with Chris Wallace in which he denied McNamee's accusations as "totally false." (Am. Compl. ¶32, Ex. F).

- December 14, 2007 - *The New York Times* reports that Clemens' attorney Rusty Hardin dismissed McNamee's statements as an "uncorroborated statement" from a "troubled and unreliable" witness. (Am. Compl. Ex. A).

- December 18, 2007 – *The New York Times* reports that Rusty Hardin publicly stated that a cooperation agreement between McNamee and the United States Attorney gave McNamee an incentive to lie. (Am. Compl. Ex. B).

- December 19, 2007 – *The New York Times* reports that Clemens issued a statement denying McNamee's allegations definitively," calling the reply "a verbal fastball." (Am. Compl. Ex. C).

- December 21, 2007- *The Houston Chronicle* reports a statement from Clemens' lawyer reiterating their stance that "Roger Clemens did not take steroids" and warning that "anybody who says he did had better start looking for a hell of a good lawyer." (Am. Compl. Ex. D).

- December 23, 2007 – Clemens issued a YouTube video statement denying the allegations, stating again that "this report is simply not true." (Am. Compl. Ex. E).

- January 6, 2008 – Clemens' 60 Minutes interview aired on broadcast television. In it, Clemens again denied all allegations as false and in response to a question about what motivation McNamee had to lie, stated that McNamee was able to avoid jail time for "buyin and movin steroids." (Am. Compl. Ex. F).

- January 7, 2008 – Clemens held a press conference to announce that he'd filed a defamation suit against McNamee. At this conference, Clemens played a taped recording of a conversation with McNamee that had allegedly been recorded without McNamee's consent. In that recording, McNamee disclosed private medical information about his son. An article published that day reported that the suit did not seek a specific amount in damages and that it was filed to protect Clemens' reputation. (Am. Compl. ¶ 34, Ex. H).

- February 7, 2008 – *The New York Times* article quotes Lanny A. Breuer's (one of Clemens' attorneys) response to the revelation that

McNamee kept blood stained gauze and syringes allegedly used to inject Clemens with HGH: "McNamee 'apparently has manufactured evidence' and is 'a troubled man who is obsessed with doing everything possible to try to destroy Roger Clemens." (Am. Compl. Ex P).

- February 8, 2008 – *The New York Times* article quotes a statement from Clemens' lawyer that "in the cheapest mean spirited stunt, [McNamee] has made up a bunch of evidence" and arguing, presumably in reference to McNamee, "[t]his is a man who wanted to shake [Clemens] down." The article goes on to report that Clemens' lawyers had unleashed a "ferocious" attack on McNamee and the physical evidence McNamee was said to have kept to support his allegations. Clemens' lawyer was also quoted accusing McNamee of "constantly lying" and stating that saving the evidence was "a psycho thing to do." (Am. Compl. Ex. K).

- February 8, 2008 – *The Houston Chronicle* reports comments from Rusty Hardin describing McNamee's evidence (syringes and other material allegedly used to inject Clemens with steroids) as "fabricated waste." Hardin continued, "this guy is off the deep-end. All it shows is what a desperate person is trying to ruin Roger." (Am. Compl. Ex. O).

- March 5, 2006 – *The New York Times* reports a statement made by Clemens' lawyer, Rusty Hardin, in an email: "Brian McNamee's statements to the Mitchell commission and others concerning steroid and HGH use by Roger Clemens are absolutely false and the very definition of defamatory." (Am. Compl. Ex. L).

- May 6, 2008 – *The New York Times* article reports that Clemens' suit for defamation against McNamee, filed in Texas state court, was an "attempt to discredit McNamee's assertions." (Am. Compl. Ex. M).

In early 2008, the House Committee on Oversight and Government Reform (the "House Committee") launched an investigation into the differing accounts of Clemens and McNamee. To support his claims, McNamee produced physical evidence, including vials, used syringes, gauze pads, and needles said to

7

contain traces of Clemens' blood and performance enhancing drugs.  (Am. Compl. ¶ 23, Ex. K).  McNamee also provided unused needle heads, steroid pills, and unbroken testosterone ampoules that McNamee claims Clemens asked him to dispose of at the end of 2002.  (Id.).  In February 2008, both men gave depositions to staff members of the House Committee.  (Am. Compl. Ex. M).  In his testimony, Clemens continued his strident denials, directly contracting McNamee's testimony. (Id.).

Andy Pettitte, an MLB player named in the Mitchell Report, submitted an affidavit to the House Committee on February 8, 2008 stating that Clemens admitted using HGH to him in 1999 or 2000.  (Id.).  Ultimately, the House Committee recommended that the Justice Department investigate Clemens for perjury.  (Id.).  A Grand Jury was impaneled to investigate whether Clemens perjured himself in statements made to members of the House of Representatives and Clemens was indicted on perjury charges on August 19, 2010.[1]

## PROCEDURAL BACKGROUND

In January 2008, Clemens filed suit for defamation against McNamee in Texas state court.  McNamee removed the action to the United States District Court and moved to dismiss Clemens' complaint for, *inter alia*, lack of

---

[1] We take judicial notice of the fact that a grand jury returned an indictment against Clemens; however, we express no opinion as to his guilt or innocence.  Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc., 969 F.2d 1384, 1389 (2d Cir. 1992).

personal jurisdiction and failure to state a claim. <u>Clemens v. McNamee</u>, No.

08cv471, 608 F. Supp. 2d 811 (S.D.Tex. 2009). On February 12, 2009, the district

court dismissed Clemens' defamation action for lack of personal jurisdiction

because the focal point of McNamee's statements about Clemens was not Texas.

<u>Id.</u> at 820. The district court also found that if the court had personal jurisdiction

over McNamee, his statements to the Mitchell Commission were cloaked with

absolute immunity. <u>Id.</u> at 824-25. On August 12, 2010 that decision was affirmed

by the Fifth Circuit Court of Appeals. <u>Clemens v. McNamee</u>, 615 F.3d 374 (5th

Cir. 2010).

McNamee filed the instant action on December 12, 2008 in the

Supreme Court of the State of New York, Queens County. On April 22, 2009,

Clemens removed the action to this Court. On May 4, 2009, this Court granted

McNamee's request to file his amended Complaint by July 31, 2009. Clemens'

motion to dismiss was filed fully briefed, pursuant to the rules of this Court.


## <u>STANDARD OF REVIEW</u>

On a motion to dismiss pursuant to Federal Rule of Civil Procedure

("F.R.C.P.") 12(b)(6), the Court may dismiss a complaint "when 'it appears beyond

doubt that the plaintiff can prove no set of facts in support of his claims which

would entitle him to relief.'" <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957); <u>accord</u>

<u>Cohen v. Koenig</u>, 25 F.3d 1168, 1172 (2d Cir. 1994). When considering a motion

to dismiss under Rule 12(b)(6), a court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001).

*Consideration of Evidence Outside of the Complaint*

Defendant's motion to dismiss is accompanied by numerous documents neither annexed to the Complaint nor referenced therein. (See Clemens Mem. of Law in Supp. of his Mot. to Dismiss Exs. A-I). Under Rule 12(b), a court may not consider materials not appended to the Complaint, unless they are matters the Court may take judicial notice of. The Court considers only the "'facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'" Leonard F. v. Israel Discount Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999) (quoting Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991)). Accordingly, the documents appended to Clemens' submission were not considered in rendering this decision.

## DISCUSSION

Defendant moves to dismiss the Amended Complaint on two grounds: First, pursuant to Rule 12(b)(2), he asserts that this Court lacks personal

jurisdiction over him, as he resides in Texas.  Second, pursuant to Rule 12(b)(6),

Defendant argues that the Complaint fails to state a claim upon which relief can be

granted.

I.      Personal Jurisdiction

On a motion to dismiss, the plaintiff bears the burden of showing

that the court has jurisdiction over the defendants.  Grand River Enters. Six

Nations, Ltd. v. Pryor, 425 F.3d 158, 165 (2d Cir. 2005).  "In order to survive a

motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima

facie showing that jurisdiction exists."  Best Van Lines v. Walker, 490 F.3d 239,

242 (2d Cir. 2007).  However, prior to discovery, where a court relies on pleadings

and affidavits, a plaintiff may defeat a motion to dismiss by producing "legally

sufficient allegations of jurisdiction."  In re Magnetic Audiotape Antitrust

Litigations, 334 F.3d 204, 206 (2d Cir. 2003).  The pleadings must be credited as

true and doubts are resolved in the plaintiff's favor.  Ball v. Metallurgie Hoboken-

Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990).

When a federal court sits in diversity, it must "determine whether

there is jurisdiction over the defendant under the relevant forum state's laws."

Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d

Cir. 1999).  Accordingly, a district court must conduct a two-part inquiry when

considering a motion to dismiss for lack of personal jurisdiction.  "First, it must

determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process."  <u>Savin v. Ranier</u>, 898 F.2d 304, 306 (2d Cir. 1990).

A.    Specific Jurisdiction Under New York's Civil Practice Law Section 302

The portion of New York's long arm statute allowing for specific jurisdiction over a non-domiciliary provides that "[a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent . . . (1) Transacts any business within the state or contracts anywhere to supply goods or services in the state . . ."  N.Y. Civ. Prac. Law § 302(a)(1) (McKinney 2008).  Thus, jurisdiction is proper under section 302(a)(1) when: (1) the defendant has transacted business in New York; and (2) the cause of action arises out of the subject matter of the transacted business.  <u>See</u> <u>Best Van Lines, Inc. v. Walker</u>, 490 F.3d 239, 246 (2d Cir. 2007); <u>CutCo Indus., Inc. v. Naughton</u>, 806 F.2d 361, 365 (2d Cir. 1986) (requiring "an articulable nexus between the business transacted and the cause of action sued upon") (<u>citing</u> <u>McGowan v. Smith</u>, 52 N.Y.2d 268, 437 N.Y.S.2d 643, 419 N.E.2d 321, 323 (1981)).

The following factors should be considered when determining whether a non-domiciliary has transacted business: (1) whether the defendant has an ongoing contractual relationship with a New York corporation; (2) whether the defendant negotiated or executed a contract in New York, and whether the defendant visited New York after executing the contract with the parties; (3) whether there is a choice-of-law clause in any such contract; and (4) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.  See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996). Although "it is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction," Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467 (1988), the party's activities must be purposeful and have a "substantial nexus" with the cause of action sued upon.  See PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1109 (2d Cir. 1997); Agency Rent A Car, 98 F.3d at 29-31; CutCo Indus., 806 F.2d at 365; Cedric Kushner Prods., Ltd. v. Thobela, No. 93 Civ. 4592, 1994 WL 163992, at *2 (S.D.N.Y. Apr. 22, 1994).  Jurisdiction cannot be found upon "random," "fortuitous," or "attenuated" contacts alone.  SAS Group, Inc. v. Worldwide Inventions, Inc., 245 F.Supp.2d 543, 548 (S.D.N.Y. 2003) (citing CutCo Indus., 806 F.2d at 365); accord Burger King v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174 (1985)).  The requisite minimum contacts must provide a fair warning to the defendant of a possibility of being subject to courts of the forum

state.  Spencer Trask Ventures, Inc. v. Archos S.A., 2002 WL 417192, at *3 (S.D.N.Y. Mar. 18, 2002).

      *a.*     *Clemens Transacted Business in New York Through His Oral Agreement with McNamee*

      The Amended Complaint sufficiently pleads personal jurisdiction based on the alleged contract between Clemens and McNamee for personal training services that McNamee claims were performed in New York.  (Am. Compl. ¶ 3). According to McNamee, he and Clemens had an oral contract for 2000 and 2001 under which Clemens paid McNamee $5,000 per month, in addition to his annual salary from the New York Yankees.  (McNamee Decl. ¶¶ 6,7).  In exchange for being compensated, McNamee agreed to be available to Clemens at all times for personal training services.  (Id. at ¶ 8).  McNamee contends that the contract was negotiated, at least in part, in New York and was performed there as well.  (Id. at ¶¶ 9, 10).

      Defendant argues that because Plaintiff did not allege that their contract "required Clemens 'to supply goods or services in the state' of New York," jurisdiction cannot be established.  (Def. Mem. of Law 5 (citing N.Y.C.P.L.R. §302(a)(1))).  This argument need not detain us long.  As evidenced by the dearth of case of law cited in support of this assertion, there is absolutely no basis in state or federal jurisprudence to find that in order for a court to exercise

jurisdiction over a defendant based on a contract, the defendant must have supplied the goods or services contemplated, rather than having purchased them.

For example, in Fischbarg v. Doucet, 9 N.Y.3d 375, 880 N.E.2d 22 (N.Y. 2007), the defendants, both residents of California, contracted to hire plaintiff, a New York resident and attorney, to represent them in a copyright infringement case. Id. Although it was plaintiff, and not defendants, who provided the services, the Court of Appeals found that the quality of defendants' New York contacts allowed it to exercise jurisdiction over them. Id. at 380; see, also, Taibleson v. National Center for Continuing Educ., 190 Misc.2d 796, 740 N.Y.S.2d 772 (N.Y. City Civ. Ct. 2002) (instructor brought action against Florida company that hired him to provide a service in Texas). In Taibleson, although plaintiff, a freelance instructor, initiated contact with defendant, an education company, defendant came into New York of his own volition to meet with plaintiff and observe his work. 190 Misc.2d at 798. Despite defendant's claim that no business negotiations were discussed in New York, the court found it "hard to believe" that defendant came from Florida to meet with plaintiff and never discussed anything about the prospective employment. Id. at 799-800. By seeking out plaintiffs' services in New York, establishing an ongoing relationship, and communicating with them in this state, the defendants in both Fischbarg and Taibleson purposely availed themselves of the laws of this state despite the fact that they were buying and not selling the services at issue. Fischbarg at 381; Taibleson at 800.

Likewise, here, according to McNamee Clemens sought out his personal training services in New York, discussed the terms of the agreement in New York, established an ongoing personal trainer relationship where services were being provided in New York and communicated with McNamee regularly in state. (McNamee Decl. ¶¶ 6-8). Roger Clemens came to New York in 1999 to play baseball for the New York Yankees; a year later, he allegedly contracted to allow Brian McNamee to join him as a member of the New York team and to provide him with full-time training services, typically performed in New York. "There can be no question that, by his acts, defendant has purposefully availed himself of the privilege of conducting activities in our jurisdiction, thus invoking the benefits and protection of our law." George Reiner & Co., Inc. v. Schwartz, 41 N.Y.2d 648, 653, 363 N.E.2d 551 (N.Y. 1977).

In what appears to be a last grasp for straws, Defendant alternatively argues that jurisdiction cannot be found upon the contract between him and Plaintiff because that contract was illegal and therefore void under New York law. (Def. Reply Mem. of Law 3-4). This argument is circular at best. The basis of Clemens' testimony before the House, his Texas defamation lawsuit against McNamee, and the public campaign in his defense is that he was never injected with HGH and steroids and never had an agreement with McNamee to this end. Clemens cannot deny the existence of an agreement in one instant and attempt to use the same "nonexistent" agreement as a shield against claims that arise from it in

another. Whether or not a contract is illegal or otherwise unenforceable is an altogether separate question from whether a contract was negotiated, entered into, and performed in fashion that conveys jurisdiction over the parties. Adopting Clemens' argument would allow parties to use the illegality of an agreement to avoid the consequences arising underneath them.

Furthermore, contracts that violate a statute may be enforced as long as "the statute does not provide expressly that its violation will deprive the parties of their right to sue on the contract," Lloyd Capital Corp. v. Pat Henchar, Inc. et al., 80 N.Y.2d 124, 127, 589 N.Y.S.2d 396, 603 N.E.2d 246 (1992) (quoting John E. Rosasco Creameries, Inc. v. Cohen, 276 N.Y. 274, 278, 11 N.E.2d 908 (1937)), and the "loss of judicial recourse [isn't] out of proportion to the requirements of public policy or appropriate individual punishment." Wowaka & Sons, Inc. v. Pardell et al., 242 A.D.2d 1, 5, 672 N.Y.S.2d 358 (2d Dep't 1998).

New York courts are more amenable to enforcing such contracts "where there are [other] regulatory sanctions and statutory penalties in place to redress violations of the law," Lloyd Capital Corp., 80 N.Y.2d at 128, or where the party who is alleged to have breached the contract is attempting to improperly use public policy "'as a sword for personal gain rather than a shield for the public good.'" Id., at 128, 589 N.Y.S.2d 396, 603 N.E.2d 246 (quoting Charlebois v. J.M. Weller Associates, 72 N.Y.2d 587, 595, 535 N.Y.S.2d 356, 531 N.E.2d 1288

(1988)). The governmental authorities dealing with enforcing the laws against steroid use will be responsible for "redress[ing] violations of the law." Id. at 128.

That the agreement may have been oral does not change the analysis. In Eskanazi v. Spages, No. 88 CIV. 9120 (RPP), 1989 WL 16609 (S.D.N.Y. Feb. 17, 1989), the court found that where an "oral contract was substantially negotiated and agreed to in New York" and where plaintiff's performance of the oral agreement was in New York, defendant was transacting business under 302(a)(1)). Id. The Southern District highlighted the fact that "[i]t was the alleged oral contract made in New York which allegedly led to the transaction … out of which the present cause of action" arose. Id. (citing Reiner v. Schwartz, 41 N.Y.2d 648, 363 N.E.2d 551, 394 N.Y.S.2d 848 (1977) (non-resident defendant transacted business where he negotiated and executed contract in New York)); Icon Licensing Group, LLC v. Innovo Azteca Apparel, Inc., No. 04-CV-7888 (KMK), 2005 WL 992001, at *3 (S.D.N.Y. April 27, 2005) ("given that Guez allegedly entered into an oral contract with Plaintiff Icon, a New York corporation, . . . the facts might support a claim of personal jurisdiction over Guez by virtue of the fact that he 'transacts business' in New York").

Moreover, it is clear, based on the allegations in the complaint, that regardless of who was providing or receiving services and regardless of what those services were, McNamee and Clemens were involved in an ongoing relationship, the type of which gives rise to personal jurisdiction under CPLR § 302(a)(1).

        b.        *McNamee's Claims "Arise From" His Contract with Clemens*

        Even if Clemens is found to have transacted business in New York, jurisdiction under section 302(a)(1) is not proper unless the cause of action "arises from" the defendant's contacts with the forum state.  A cause of action "arises from" a defendant's New York contacts if the contacts are "substantially proximate to the allegedly unlawful acts."  Avecmedia, Inc. v. Gottschalk, No. 03 Civ. 7831, 2004 WL 1586411, at *5 (S.D.N.Y. July 14, 2004) (quoting Xedit Corp. v. Harvel Indus. Corp., 456 F.Supp. 725, 729 (S.D.N.Y. 1978)).  Thus, the business transacted by the foreign defendant in New York must "bear a substantial relationship to the transaction out of which the instant cause of action arises."  McGowan v. Smith, 52 N.Y.2d 268, 437 N.Y.S.2d 643, 419 N.E.2d 321, 323 (1981).  A "merely coincidental" connection is insufficient for jurisdiction.  Sole Resort, S.A de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006).

        As described above, McNamee claims that as a result of his revealing that he allegedly injected Clemens with steroids, Clemens launched a fierce public relations campaign designed to be a sockdolager, defaming McNamee, filing a baseless lawsuit against McNamee in Texas, and making statements causing McNamee severe emotional distress.  McNamee alleges that the contract between he and Clemens contemplated the steroid use Clemens now vociferously

denies and that these denials form the basis of his claims. The agreement was part of a long relationship between the parties during which McNamee provided Clemens with personal training services. The contract was allegedly made while Clemens was employed by a New York sports team and was performed in part in New York. This is sufficient to make a prima facie case that Clemens' contacts with the state had the required nexus with McNamee's claims. See Imagine Solutions, LLC v. Medical Software Computer Systems, Inc., No. 06 CV 3793, 2007 WL 1888309, at * 6 (E.D.N.Y. June 28, 2007) (finding that plaintiff's causes of action for breach of contract, quantum meruit, fraud, defamation, unjust enrichment, and copyright ownership directly related to an alleged oral agreement that was a key part of the business arrangement).

Clemens contends that there is not a sufficient nexus between his in-state contacts and McNamee's causes of action for the court to find jurisdiction under § 302(a)(1). In particular, Clemens argues that his contacts with New York, through the alleged contract with McNamee, ended in 2001 and have no relationship with his alleged defamatory statements seven years later. (Def. Mem. of Law 8-10). This position is not persuasive. That the statements are apart in time from the contract is of no moment. The alleged contract was part of a long relationship between the parties during which McNamee provided Clemens with personal training services. What happened in those training sessions is the subject of the alleged defamatory statements at issue in this lawsuit. The contract was

made while Clemens was employed by a New York sports team and was performed in part in New York.  In 777388 Ontario Ltd. v. Lencore Acoustics Corp., 142 F. Supp. 2d 309 (E.D.N.Y. 2001), although the conduct challenged by plaintiff did not begin until three years after the parties engaged in business negotiations, the scheme was alleged to have begun in part because of the parties' failed negotiations; therefore, personal jurisdiction was properly supported.  Id. at 321; see, also, Legros v. Irving, 38 A.D.2d 53, 56, 327 N.Y.S.2d 371 (1st Dep't 1971) (finding a defamation action sufficiently related to New York where all significant actions culminating in publication of defamatory book occurred in state and noting that "[t]here is no requirement that jurisdiction be grounded upon either the final act or the ultimate act causing the injury. It is sufficient if the cause of action is related to and grows out of the transaction of business in New York."); Hanly v. Powell Goldstein, LLP, No. 05 CV 5089(KMW), 2007 WL 747806, at *3 n.3 (S.D.N.Y. March 9, 2007) (a lapse of time is not dispositive where there is a nexus between the Plaintiffs' cause of action and the business transacted in the state).

Defendant's reliance on Talbot v. Johnson Publishing Corp., 71 N.Y.2d 827 (1988), in which the Court of Appeals declined to exercise jurisdiction over a party after two years elapsed between the party's New York business and the events giving rise to the claim, is to no avail.  Id. at 830.  Unlike the parties in Talbot, who did not conduct themselves in a manner that would give rise to a claim

while they were availing themselves of the forum, Clemens was conducting New York business at the time of the alleged injections.

Moreover, New York courts have held that a "nondomiciliary which takes advantage of New York's unique resources in the entertainment industry has purposefully availed itself of the benefits of conducting business in the State, such that long-arm jurisdiction may be asserted where the cause of action arises out of that transaction." Courtroom Television Network v. Focus Media, Inc., 264 A.D.2d 351, 695 N.Y.S.2d 17, 19 (1999); see, also, DiBella v. Hopkins, 187 F. Supp. 2d 192, 197-98 (S.D.N.Y. 2002) (finding jurisdiction where a boxing advisor, matchmaker, and television packager brought action against professional boxer for libel per se and quantum meruit); World Wrestling Federation Entertainment, Inc. v. Bozell, 142 F. Supp. 2d 514 (S.D.N.Y. 2001). In DiBella, plaintiff, a boxing matchmaker formerly employed by the Home Box Office ("HBO"), alleged that he was defamed by defendant Bernard Hopkins, a professional boxer. Id. at 194. Hopkins publicly accused DiBella of improper conduct, telling reporters that while DiBella was still employed by HBO, DiBella asked him for - and he paid DiBella - $50,000 to arrange for his fights to be televised on HBO. Id. The court found that Hopkins' allegedly defamatory statements related to his efforts to establish a relationship with HBO and the services that DiBella eventually provided to Hopkins in connection with HBO. Id. Because Hopkins sought to purposefully avail himself of the benefits of conducting

22

business in the state by seeking to take advantage of New York's "unique resources" in the entertainment and sports fields, and plaintiffs' claims arose out of that purposeful activity, the court could properly exercise long-arm jurisdiction over him.  Id. at 198.

Personal jurisdiction has also been established when the events giving rise to the claim occur within the forum, but the actual cause of action takes place outside the forum.  See Seven Seas Merger, Corp. v. Ford, No. 93 Civ. 6500 (LMM), 1994 WL 9778 (S.D.N.Y. Jan. 11, 1994).  In Seven Seas Merger, the parties entered an agreement to produce a film.  Id. at *1.  The negotiations, contract signing and execution, production of the film occurred in New York, and involved a company domiciled in New York.  Id.  The libelous acts were conducted outside the forum, but after viewing the defendant's contacts with the forum in its entirety, the court found a substantial nexus between the contacts with the forum and the cause of action.  Seven Seas Merger, 1994 WL 9778, at *5.  Similarly, the events giving rise to the dispute between the parties here occurred largely within the forum and involved an individual domiciled in New York.  McNamee's cause of action has a substantial nexus with and can be said to have risen from the training sessions that were the subject of his contract with McNamee.


*Other Grounds for Jurisdiction*

Plaintiff also argues that Defendant transacted business in New York through alleged contracts with the Corporate Broadcasting Service ("CBS"), the producer of *60 Minutes*, and Hendricks Sports Management. The Court does not have the full scope of details regarding Clemens' agreement with CBS. Neither the Court, nor McNamee presumably, knows whether Clemens had a contract with CBS, where it was negotiated or executed, whether there was a forum selection clause or a choice of law clause, or whether there was an agent who handled any of this. All that has been alleged is that Clemens transacted business with CBS, a New York corporation, the show was broadcast in New York and particularly relevant to New York audiences. (Am. Compl. ¶ 3). Likewise, McNamee's allegations that Clemens had a contract with Hendricks Sports Management, a New York based company, is not supported with any evidence detailing the existence of the agreement, the location of the negotiations and execution, and whether or not there was a choice of law clause. (Id.). Furthermore, McNamee has not demonstrated how any of his claims arose out of this agreement.

Because the Court has found that the alleged agreement between Clemens and McNamee provides a basis for the Court to assert personal jurisdiction over Clemens, further analysis on this point is unnecessary. However, if the oral agreement between the parties did not provide for jurisdiction, the Court would grant Plaintiff's request for jurisdictional discovery, pursuant to CPLR 3211(d), to determine whether the alleged agreements between Defendant and *60*

*Minutes* or Hendricks Management Company satisfies the "transacting business" standard. McNamee has demonstrated the possible existence of jurisdictional facts that would support his allegations, a "sufficient start" in showing that jurisdiction could exist. SNS Bank v. Citibank, 7 AD3d 352, 354 (1st Dep't 2004).

      B.      Jurisdiction Does Not Offend Traditional Notions of Fair Play and Justice

Lastly, the court must determine whether exercising jurisdiction would "offend traditional notions of fair play and substantial justice." See International Shoe Co. v. Washington, 326 U.S. 310, 315 (1945); see also, Best Van Lines, Inc. v. Walker, 490 F.3d 239 (2d Cir. 2007) (court held that asserting jurisdiction would offend fair play and substantial justice over the owner of a moving industry website, in that the defendant did not possess the requisite minimum contacts); Ingraham v. Carroll, 90 N.Y.2d 592 (1997) (the court held jurisdiction was not proper because defendant did not have sufficient contacts within the state, and it would be unfair to force the defendant to defend the claim within the forum); Deutsche Bank Securities, Inc. v. Montana Bd. of Investments, 7 N.Y.3d 65 (2006) (court asserted personal jurisdiction over the defendant investment company because defendants could have reasonably foreseen being hauled into court).

Here, Clemens knew McNamee lived and worked in New York, and assuming McNamee's allegations are true, Clemens aimed his defamatory remarks

towards New York to discredit him. McNamee cites approximately seven *New York Times* articles in which Clemens allegedly defamed McNamee; an interview with *60 Minutes*, a national broadcast; three articles published in Houston, Texas, and claims that all these occurrences were orchestrated by Clemens in order to injure McNamee within the forum. (Pl. Opp'n Mem. 17-23). Accepting the allegations that Defendant's conduct outside the forum caused harm within the forum as true, Clemens could "reasonably anticipate being hauled into court to answer for the truth about the statements made." <u>Calder</u>, 465 U.S. at 789. In light of the above, the Court finds that jurisdiction over Defendant is proper. The Court does not reach the issue of whether we would be able to assert general jurisdiction in this case. Defendant's motion to dismiss for lack of personal jurisdiction is DENIED.

II.     Defamation

Plaintiff accuses Defendant of committing multiple acts of defamation, divided into four general types of statements: statements that McNamee is a liar, statements that McNamee manufactured evidence, statements that McNamee has a mental disorder, and statements that McNamee is extorting Clemens. To succeed on his claims for defamation, McNamee must allege 1) a false statement, 2) that was published without privilege or authorization to a third party, 3) constituted fault as judged by, at a minimum, a negligence standard, and

4) either caused a special harm or constituted defamation per se. <u>See</u> <u>Chao v.</u> <u>Mount Sinai Hosp.</u>, No. 10 CV 2869 (HB), 2010 WL 5222118, at *6 (S.D.N.Y. Dec.17, 2010).

It is for the court to decide whether the statements complained of are "'reasonably susceptible of a defamatory connotation,' thus warranting submission of the issue to the trier of fact." <u>Silsdorf v. Levine</u>, 59 N.Y.2d 8, 12-13, 449 N.E.2d 716 (N.Y. 1983). If the court concludes that the statements are reasonably susceptible of a defamatory connotation, it then becomes a jury function to determine how the words were likely to be understood by the ordinary and average reader or listener. <u>See</u> <u>Curry v. Roman</u>, 217 A.D.2d 314, 635 N.Y.S.2d 391 (4th Dep't 1995). "The alleged defamatory words should be considered 'in the context of the entire statement or publication as a whole, tested against the understanding of the average [listener].'" <u>Allen v. CH Energy Group, Inc.</u>, 58 A.D.3d 1102, 1103, 872 N.Y.S.2d 237 (3d Dep't 2009) (<u>quoting</u> <u>Aronson v. Wiersma</u>, 65 N.Y.2d 592, 594, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (1985)); <u>see</u> <u>also</u>, <u>Rossi v. Attanasio</u>, 48 A.D.3d 1025, 1027, 852 N.Y.S.2d 465 (2008).

To be actionable, a provable statement of fact is required; "rhetorical hyperbole" or "vigorous epithet" will not suffice. <u>Greenbelt Cooperative Publishing Assn. v. Bressler</u>, 398 U.S. 6, 14, 90 S.Ct. 1537 (1970); <u>see</u> <u>also</u>, <u>Gross v. New York Times Co.</u>, 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993) (noting that only facts "are capable of being proven false"). Determining

whether a given statement expresses fact or opinion is a question of law for the court and must be answered "on the basis of what the average person hearing or reading the communication would take it to mean." Steinhilber v. Alphonse, 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986)

*Statements that McNamee is a liar*

Accusations of venality have long been considered defamatory when not grounded in truth or reasonable basis. Edwards v. National Audubon Soc., Inc. 556 F.2d 113 (2d. Cir. 1977) (accusation that party was a "paid liar" was defamatory); Seung Jin Lee v. Tai Chul Kim,16 Misc.3d 1118(A), 847 N.Y.S.2d 899 (Table), 2007 WL 2241493, at *4 (N.Y.Sup. Jan. 4, 2007) (denying defendant's motion to dismiss a defamation cause of action based on a statement that plaintiff "is a liar; she tried to cover all the truth; how could she serve the Lord with lies; and she and her followers are satanic"); Curry v. Roman, 217 A.D.2d 314, 635 N.Y.S.2d 391 (4th Dep't 1995) (statements by owner of art gallery and its agent that auctioneer and his business were "crooks," "liars," "thieves," and "swindlers," and that there was "some sort of collusion somewhere along the line" were defamatory as a matter of law).

Although "a statement of opinion accompanied by a full recitation of the facts on which it is based will be deemed a pure opinion, . . . a statement of opinion that implies a basis in undisclosed facts is actionable 'mixed opinion.'"

Clark v. Schuylerville Cent. School Dist., 24 A.D.3d 1162, 1163, 807 N.Y.S.2d 175 (2005). The actionable element of a "mixed opinion" is not the false opinion itself-it is the implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking. See Steinhilber, 68 N.Y.2d at 290 (applying an "ordinary listener" standard). Following the Supreme Court's decision in Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S.Ct. 2695 (1990), New York's Court of Appeals adapted a three-factor test for differentiating statements of protected opinion from those asserting or implying actionable facts: 1) whether the specific language in issue has a precise meaning which is readily understood; 2) whether the statements are capable of being proven true or false; and 3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to "signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact." Gross v. New York Times Co., 82 N.Y.2d 146, 153, 623 N.E.2d 1163 (N.Y. 1993) (noting that the dispositive inquiry, under either Federal or New York law, is "whether a reasonable [reader] could have concluded that [the articles were] conveying facts about the plaintiff… only 'facts' are capable of being proven false [therefore] only statements alleging facts can properly be the subject of a defamation action").

      Applying Gross to the facts before the Court, Clemens' statements that McNamee is a liar are facts capable of being proven true or false by a

determination of whether or not McNamee in fact injected Clemens with steroids. The statements can be proven true or false by either truthful testimony or conclusive evidence.

While general denials of accusations aren't actionable, denials coupled with accusations that the accuser will be proven a liar and has lied in front of members of Congress cross the line from general denial to specific accusations reasonably susceptible of a defamatory meaning. In <u>Brach v. Congregation Yetev Lev D'Satmar, Inc.</u>, 265 A.D.2d 360, 361 696 N.Y.S.2d 496, 498 (2d Dep't 1999), a religious congregation published an article reporting that property they purportedly owned was sold to plaintiff without their knowledge or consent, and that plaintiff refused to settle the dispute in rabbinical court, leading to a state court action the congregation claimed was won "'by lies and deceit.'" <u>Id.</u> at 360. The article also called plaintiff a robber. <u>Id.</u> In finding that the statements complained of implied that the statements were actionable statements of "mixed opinion," the Court noted that the statements suggested to the average reader that they were supported by some unknown facts. <u>Id.</u> at 361. Similarly, here, some of Clemens' statements branding McNamee a liar contain the "actionable implication that [Clemens] knows certain facts, unknown to his audience, which support his opinion." <u>Brach</u>, 265 A.D.2d at 361. The statement that "[McNamee] is constantly lying…I warn you five to six to seven months from now, any of you that have jumped on the bandwagon that Roger took steroids and assumed anything Brian

McNamee had to say will be embarrassed," (Am. Compl. Ex. K), could reasonably be interpreted to mean that there is undisclosed evidence exonerating Clemens that has not but will soon be revealed and make all of his doubters fools.  Likewise, the statement that  "Brian McNamee's statements to the Mitchell commission and others concerning steroid and HGH used by Roger Clemens are absolutely false and the very definition of defamatory," (Am. Compl. Ex. L), made by Clemens' attorney may be reasonably interpreted to mean that Clemens has evidence to prove that McNamee perjured himself and committed defamation.

Moreover, it is well-established that a "charge that a man is lying, at least, in a matter of public interest, is such a charge as tends to hold him up to scorn, as matter of law."  Mase v. Reilly, 206 A.D. 434, 436 201 N.Y.S. 470, 472 (1st Dep't 1923); see also, Kaminester v. Weintraub, 516 N.Y.S.2d 234 (2d Dep't 1987) (finding allegedly libelous statements accusing plaintiff of personal dishonesty were not constitutionally protected expressions of opinion).  An attack on a person's integrity by impugning his character as dishonest or immoral may form the basis of a defamation if an ordinary listener would tend to credit the statements as true.  See, e.g., Armstrong v. Simon & Schuster, Inc., 85 N.Y.2d 373, 649 N.E.2d 825 (N.Y. 1995)  (finding a statement in book that attorney presented his client with an affidavit containing facts that were not true was susceptible of defamatory meaning and was not protected as opinion); Curry v. Roman, 217 A.D.2d 314, 635 N.Y.S.2d 391 (4th Dep't 1995) (statements that party was

"crooks", "liars", "thieves", and "swindlers" were actionable), *dismissed on other grounds*; Leal v. Holtvogt, 123 Ohio App.3d 51, 702 N.E.2d 1246 (Ohio App. 2d Dist. 1998) (applying a standard similar to New York's, finding that statements made to plaintiff's customers that plaintiff lied and cheated her would be viewed by an ordinary person "as fact, not mere opinion, because their meaning is clearly ascertainable, not ambiguous").

      In Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 185-86 (2d Cir. 2000), the Second Circuit found that in the context of the entire publication - part of which stated that plaintiff threatened to call a third party numerous derogatory terms on the air unless she met her financial obligations to him – the accusations at issue could cause a reader to question plaintiff's professional integrity. Id. Likewise, in Milkovich v. Lorain Journal Co., 497 U.S. 1, 2110 S.Ct. 2695, 2697 (1990), the Supreme Court found that a reasonable fact-finder could conclude that the statements implied an that plaintiff perjured himself in a judicial proceeding. The statement did not use the sort of "loose, figurative, or hyperbolic" language that would negate the impression that the speaker was seriously maintaining plaintiff committed perjury. Id. Furthermore, the article's general tenor did not negate this impression. Id. The connotation that plaintiff committed perjury was sufficiently factual that it was susceptible of being proven true or false by comparing plaintiff's testimony.

Here, Clemens' statements are at least reasonably susceptible of implying McNamee is dishonest and committed perjury. The statements that brand McNamee a liar and suggest that there are unknown facts that when disclosed will support Clemens' denials and that suggest that the statements meet the definition of defamation go beyond a general denial of accusations or rhetorical name calling. The statements were direct and often forcefully made, there was nothing loose or vague about them.  If McNamee's allegations are proven, Clemens will have knowingly lied when he called McNamee a liar and his statements defamatory. These statements impugning his integrity can form the basis of a defamation action. While it is always possible that a jury will decide that an ordinary listener would consider the statements opinion, the words convey an air of truth sufficient to survive a motion to dismiss.

*Statements that McNamee Manufactured Evidence*

Clemens declares, without support, that "[r]efuting false evidence is not defamation."  However, on a motion to dismiss where the Court must credit Plaintiff's recitation of the facts and no discovery has been conducted, the Court cannot conclude that the evidence here was false.  While the Court agrees that the statement that the evidence was "the most cheap mean-spirited stunt" is hyperbolic opinion incapable of an objective determination, the same conclusion cannot be reasoned for the other statements suggesting that McNamee manufactured

evidence.  Like the statements that McNamee lied, these statements are reasonably susceptible to the interpretation that it is based on undisclosed facts.

The Court credits McNamee's argument that in the context of Clemens' vehement denial of McNamee's allegations, statements that McNamee fabricated evidence could be interpreted to mean that such evidence had to be fabricated because it could not exist in the face of Clemens' version of the truth. Like the statements that McNamee lied, the Court believes statements that McNamee fabricated evidence are reasonably open to interpretation as fact and cannot be dismissed at this stage in the litigation.

While Clemens would like to characterize these statements as being made in "the in the midst of a heated public debate," a review of the context the statements were made in contradicts presents a more calculated picture.  (Def. Reply at 7).  Unlike 600 West 115th Street Corp. v. Von Gutfeld, 80 N.Y.2d 130, 603 N.E.2d 930 (N.Y. 1992), cited by Defendant, where the statements at issue were made during a heated public hearings, Clemens' statements, no matter how passionately delivered, were made in pre-scheduled press conferences and other pre-planned public appearances.  This was not a debate in which emotions might lead to exaggerated statements.  See Rajneesh Foundation Intern. v. McGreer, 303 Or. 371, 737 P.2d 593 (Or. 1987) (finding that statements that plaintiff was "lying," that "What she is doing is being absolutely malicious. What she has been doing,

she has been saying nothing but lies…she lies a lot" . . . "were not uttered in the heat of passion or the excitement of the moment" and were not actionable).

*Statement Charging that McNamee has Mental Disorder*

McNamee points to multiple statements made by Clemens or his agents suggesting that McNamee has a mental disorder: 1) a February 7, 2008 article in the *New York Times* reported a statement from Clemens' agent that McNamee was "a troubled man who is obsessed with doing everything possible to destroy Roger Clemens" and someone "who's crazy enough to say he kept syringes for nine years," (Am. Compl. Ex. P.); 2) a February 8, 2008 article in the *New York Times* reported a statement from Clemens' agent that McNamee's purported evidence "was manufactured by an unstable accuser with a vendetta" and referring to saving the paraphernalia as "a psycho thing" to do. (Am. Compl. Ex. N). Clemens' statements cannot be interpreted by a reasonable listener as provable fact that McNamee has a medical condition. See, e.g. O'Brien v. Lerman, 498 N.Y.S.2d 395 (2d Dep't 1986) (assertion that attorney "went crazy" at real estate closing merely indicated attorney's extremely angry reaction, and could not reasonably be understood by mind of ordinary intelligent reader as imputing to attorney insanity or mental instability). Unlike the statements implying McNamee has lied or been

dishonest, statements implying McNamee has a mental disorder are rhetorical hyperbole and thus nonactionable.

*Statements Charging that McNamee is Extorting Clemens*

McNamee points to the following statements made by Clemens' agents that allegedly suggest McNamee attempted to extort Clemens: 1) in a February 8, 2008 *New York Times* article reporting statements by Clemens' agent stated that McNamee "wanted to shake Roger down" and "is constantly lying" (Am. Compl. Ex. K); and 2) in a May 12, 2009 interview Clemens gave to the ESPN's "Mike & Mike in the Morning" show where he stated, regarding McNamee's allegations, "…I can't defend a negative. When you've got somebody out there that is really just crawling up your back to make a buck, which is what this is." (Am. Compl. Ex. F).  Unlike the statements that McNamee lied or manufactured evidence, the statements above sound in opinion not fact.  Colloquial phrases like "shake down" or "crawling up your back" are hyperbolic; they are "loose" statements that don't reasonably convey the specificity that would suggest that Clemens or his agents were seriously accusing McNamee of committing the crime of extortion.  See, e.g., Galasso v. Saltzman, 42 A.D.3d 310, 311, 839 N.Y.S.2d 731 (1st Dep't 2007) (calling party in a real estate dispute "no good," "a

36

criminal," that he was "engaged in criminal conduct," and had "committed crimes" against the property in an effort to "destroy both our properties and our beach" was not actionable); 600 West 115th Street Corp. v. Von Gutfeld, 603 N.E.2d 930 (N.Y. 1992) (Tenant's statement at public hearing on another tenant's building permit application that "the lease and proposition [or composition] is as fraudulent as you can get and it smells of bribery and corruption" was not actionable defamation given loose nature of language and general tenor of remarks made at public hearing); Trustco Bank of New York v. Capital Newspaper Div. of Hearst Corp., 213 A.D.2d 940, 942, 624 N.Y.S.2d 291, 293 (3rd Dep't 1995) (finding the statement "[e]xtortion-that's what Trustco is looking for- does not necessarily make his remarks actionable statements of fact as no reasonable reader could understand it to mean that plaintiff committed the criminal act of extortion").  In Galasso, the court reasoned that there was no reasonable basis for interpreting the statements as implying that the speaker knew of additional, undisclosed facts regarding the party's purported criminality.  Id. at 311.  Likewise, here, there were never any serious allegations levied against McNamee for extortion.  Statements suggesting McNamee committed extortion cannot be used to sustain McNamee's defamation claim.

 Clemens' assertions of truth are premature at this stage.  See, Garcia v. Puccio, 17 A.D.3d 199, 793 N.Y.S.2d 382 (1st Dep't 2005) (defendants' reliance upon the apparent truth of the statement is premature at pre-answer stage because a

claim of truth is an affirmative defense to be raised in defendants' answer); <u>Ward v. Klein</u>, 10 Misc.3d 648, 651-52, 809 N.Y.S.2d 828 (N.Y.Sup. 2005) (denying motion to dismiss based on truth because "the falsity of the statement is not an element of plaintiff's prima facie case but rather is a defense to the alleged defamation").  This is not a matter where the statements are directly supported by evidence attached to the complaint.  <u>Drakes v. Rulon</u>, 6 Misc.3d 1025(A), 800 N.Y.S.2d 345 (Table) (N.Y.Sup. 2005).  To dismiss the complaint on the defense of truth the Court would have to credit Clemens' version of events over McNamee's version; this we cannot do.

   Clemens' consent defense fails to meet the standard required to dismiss the Complaint.  As an initial matter, the evidence Clemens relies on to support his consent defense may not be considered by the Court as it is outside of the pleadings.  However, even if Clemens could otherwise support his allegations, they would fail as a matter of law.  A review of case law indicates that the type of consent accepted as a completed defense to a defamation action is specific consent, typically initiated by the plaintiff, which clearly indicates that the plaintiff was aware of and agreed to the possibility that defamatory statements might be published.  <u>See</u>, <u>e.g.</u>, <u>Schaefer v. Brookdale University Hosp. and Medical Center</u>, 18 Misc.3d 1142(A), 859 N.Y.S.2d 899 (Table) (N.Y.Sup. 2008) (finding that a release and consent to the publication of alleged defamatory matter bars a defamation claim); <u>Hirschfeld v. Institutional Investor, Inc.</u>, 260 A.D.2d 171, 688

N.Y.S.2d 31 (1st Dep't 1999) (plaintiff sent a letter to requesting a written statement of the reason for her termination, thus, consenting to the publication); LeBreton v. Weiss, 256 A.D.2d 47, 680 N.Y.S.2d 532 (1st Dep't 1998) (plaintiff had two individuals contact defendant "under the pretense of being landlords" and had them make certain inquiries to which defendant responded by making the defamatory statements upon which the action was premised).

These cases are distinguishable from the facts at issue here. McNamee does not base his claim for defamation on statements published in the Mitchell Report, which he consented to. McNamee bases his defamation claim on statements made by Clemens in reaction to that report. Even if the Court considered statements that McNamee expected Clemens to call him a liar and that he could "do what he had to do," those statement hardly rise to the same level as the consents considered in the cases above. In light of the above, Clemens' motion to dismiss McNamee's claim for defamation is DENIED in part and GRANTED in part.

III.    Judicial Proceedings Privilege

In resolving whether statements made by Clemens or his agents were absolutely privileged as statements made in the course of a judicial proceeding, the Court looks to Texas state law. A federal court sitting in diversity must look to the choice-of-law rules of the state in which it sits to resolve conflict-

of-law questions.  <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22 (1941).  In tort actions, New York courts apply an interest analysis.  <u>See</u> <u>Babcock v. Jackson</u>, 12 N.Y.2d 473, 481-82, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963); <u>Schultz v. Boy Scouts of America</u>, Inc., 65 N.Y.2d 189, 196-97, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985); <u>see also</u> <u>Machleder v. Diaz</u>, 801 F.2d 46, 51 (2d Cir. 1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987).  Under such an analysis, the law of the jurisdiction having the greatest interest in the litigation applies.  <u>Schultz</u>, 65 N.Y.2d at 197, 491 N.Y.S.2d 90, 480 N.E.2d 679.  In deciding which state has the prevailing interest in an action dealing with conduct-regulating laws, such as the judicial proceeding privilege, we look to the locus of the tort, i.e. the court in which the underlying action was brought.  <u>See</u> <u>AroChem Intern., Inc. v. Burkle</u>, 968 F.2d 266, 270 (2d Cir. 1992).  Thus, Texas law applies.

In Texas, "communications made in the due course of a judicial proceeding will not serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made."  <u>James v. Brown</u>, 637 S.W.2d 914, 916 (Tex. 1982).  This privilege extends to any statements made by the judges, jurors, counsel, parties, or witnesses and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits, and any of the pleadings or other papers in the case.  <u>James</u>, 637 S.W.2d at 916-917.  The privilege not only extends to statements made during

litigation, but also to statements made in contemplation of and preliminary to judicial proceedings.  See Watson v. Kaminski, 51 S.W.3d 825, 827 (Tex.App.-Houston  2001) (holding that letter alleging that prisoner was trying to extort money from appellants and that he was likely to be sued if he attempted to do so came within judicial privilege, even though no litigation was pending).  When deciding the issue, "the court must consider the entire communication in its context, and must extend the privilege to any statement that bears some relation to an existing or proposed judicial proceeding." Russell v. Clark, 620 S.W.2d 865, 870 (Tex.Civ.App.-Dallas 1981).  All doubt should be resolved in favor of the relevancy of the statement.  Id.

   For example, in Russell, 620 S.W.2d at 865, cited by Defendant, the defendant sent a letter to plaintiff's investors informing them of a judgment in a litigation and seeking information to use as evidence in a related action.  Because the communication related to a judicial proceeding and was in furtherance thereof, it was absolutely privileged and could not form the basis of a defamation action.  Id.  Likewise, in Daystar Residential, Inc. v. Collmer, 176 S.W.3d 24 (Tex.App.-Houston 2004), defendant argued that a press release advising the media that a lawsuit for wrongful death had been filed, including a basic description of the allegations, did not amount to publication outside of the judicial proceedings.  Id. at 28.  The court agreed, finding that the statements at issue merely discussed in general terms the issues that would form the basis of the lawsuit.  Id.  Unlike the

statements here, the press release did not use derogatory labels to refer to plaintiff

or use incendiary language to persuade the court of public opinion; defendants

statements merely "report[ed] on the proposed litigation, remarked on

circumstances which were similar to those of his client and referenced them to the

case that he planned to file in the near future." Id. at 28-29. Similarly, in Dallas

Indep. Sch. Dist. v. Finlan, 27 S.W.3d 220, 238-40 (Tex.App.-Dallas 2000), the

first amended petition itself and the statements in a press release that related the

allegations were absolutely privileged pursuant to the judicial proceeding privilege.

Id. at 782. The statement at issue, that "the DISD has been patiently dealing with

[the defendants] within the confines of the courtroom in suits initiated by them . . ."

relates to pending litigation among the same parties. Id. None of the cases

Clemens presented involve a situation where a party or its attorney has called a

press conference to refute allegations of wrongdoing. See, e.g., Gentile v. State Bar

of Nevada, 501 U.S. 1030, 111 S.Ct. 2720 (U.S. 1991) ("far from an admission that

the [attorney] sought to 'materially prejudic[e] an adjudicative proceeding,'

petitioner sought only to stop a wave of publicity he perceived as prejudicing

potential jurors against his client and injuring his client's reputation in the

community").

      Although the judicial privilege is well-established in Texas'

jurisprudence, in Levingston Shipbuilding Co. v. Inland West Corp., 688 S.W.2d

192, 196 (Tex.App. 9 Dist. 1985), the court asked the question: "How far does the

privilege go?"  There, court addressed the question of whether the defendant, by filing a lawsuit, then arranging to have his petition delivered to the news media, had "stepped out of the umbrella of privilege."  Id. at 196-97.  The court found that it did.  Almost a decade later, in Hill v. Herald-Post Pub. Co., 877 S.W.2d 774, 782-83 (Tex.App.-El Paso), *aff'd in part*, *rev'd in part*, 891 S.W.2d 638 (Tex.1994), the court criticized Levingston, arguing that Levingston mistakenly relied on De Mankowski v. Ship Channel Development Co., 300 S.W. 118 (Tex.Civ.App.-Galveston 1927).  The court distinguished De Mankowski as based on slanderous statements that were made to various people before and after filing the lawsuit, not the pleadings on file with the court.  Hill, 877 S.W.2d at 783 (citing De Mankowski, 300 S.W. at 121-22).  However, Hill did not overrule Levingston, it merely clarified that its holding only applies to statements made outside of a judicial proceeding or statements not based on the pleadings.  See Rose v. First American Title Ins. Co. of Texas, 907 S.W.2d 639 (Tex.App.-Corpus Christi 1995) (distinguishing Levingston and De Mankowski);  compare Riley v. Ferguson, No. 01-98-00350-CV, 1999 WL 191654 (Tex.App.-Hous. April 8, 1999) (applying the reasoning of Hill to a case in which copies of a pleading were mailed to individuals and delivered to a condominium manager); with Pisharodi v. Barrash, 116 S.W.3d 858, 864 (Tex.App.-Corpus Christi 2003) ("although libelous statements made in connection to a judicial proceeding are absolutely privileged, re-publication of such statements outside of the judicial context waives the privilege"); Alaniz v. Hoyt,

43

105 S.W.3d 330, 341 (Tex.App.-Corpus Christi 2003) (noting that "the absolute privilege is lost if the holder of the privilege repeats the statements outside the protected context within which the statements originally were made"); <u>Hearst Corp. v. Skeen</u>, 130 S.W.3d 910, 926 (Tex.App.-Fort Worth 2004) ("[a]lthough libelous statements made in connection with a judicial proceeding are absolutely privileged and will not serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made, re-publication of such statements outside of the judicial context waives the privilege"), *rev'd on other grounds.* A review of the relevant treatises and case law makes it clear that statements made at a press conference, and by extension other pre-planned media events, fall outside of the privilege. <u>See</u>, <u>e.g.</u>, <u>50-Off Stores, Inc. v. Banque Paribas (Suisse) S.A.</u>, No. SA-95-CA-159, 1997 WL 790739, at *8 (W.D.Tex. May 20, 1997) ("statements made to a reporter are covered by the privilege, unless they are made at a press conference"); Restatement (Second) of Torts § 586 (2010) ("[t]he absolute privilege does not extend to a press conference").

        The out-of-court statements challenged by McNamee as defamatory fall outside the scope of protected communications under the judicial proceedings privilege. McNamee alleges that Clemens and his agent embarked on their press campaign to disseminate false information and cast McNamee in a negative light in order to clear Clemens' name. Considering the statements at issue in context, many of which took place at press conferences or other pre-planned media events, the

44

Court finds that they were made in an effort to deny the accusations made in the Mitchell Report and were not in connected with or in furtherance of the Texas lawsuit.

Moreover, Texas courts have withheld the application of the privilege where "the court found that the privilege was *purposefully exploited and abused by the defendant to serve ulterior motives*." <u>Ross v. Heard</u>, No. 04-04-00110-CV, 2005 WL 357032 (Tex.App.-San Antonio Feb. 16, 2005), <u>Id.</u> at *3 (emphasis added) (<u>citing</u>, <u>Levingston Shipbuilding Co. v. Inland W. Corp.</u>, 688 S.W.2d 192, 196-97 (Tex.App.-Beaumont 1985) (holding that privilege "cannot be enlarged into a license to go about in the community and make false and slanderous charges"); and <u>Burzynski v. Aetna Life Ins. Co.</u>, 967 F.2d 1063, 1068 (5th Cir. 1992) (defendant could not claim the privilege to avoid liability for sending out defamatory material to parties having no cognizable legal interest in pending litigation)). The Restatement concurs that the judicial proceeding rule "applies only when the communication has some relation to a proceeding that is *contemplated in good faith* and under serious consideration." McNamee alleges that the proceedings at issue here were not contemplated in good faith, but rather, were part of a larger public relations campaign to defame him. Crediting McNamee's recitation of facts as true, the Court finds that the privilege cannot apply when the statements are made in furtherance of a frivolous lawsuit and outside the context of a judicial proceeding.

At the very least, McNamee's allegations are to sufficient to survive the instant motion to dismiss. "A claim of privilege is an affirmative defense, which, if applicable at all, is far better suited to a motion for summary judgment than a motion to dismiss for failure to state a claim." <u>De Mino v. Alvarez</u>, No. 14-02-00173-CV, 2002 WL 31769414, at *3 (Tex.App.-Houston 2002); <u>see</u>, <u>also</u>, <u>Helfand v. Coane</u>, 12 S.W.3d 152, 157 (Tex.App.-Houston 2000) ("the issue of whether Helfand's claims are barred by absolute privilege, although a question of law, is fact intensive and dependent. This is because the statements in dispute are out-of-court statements that require the trial court to engage in an analysis different from one that applies to in-court statements"); <u>Daystar Residential, Inc. v. Collmer</u>, 176 S.W.3d 24 (Tex.App.-Houston 2004) ( determining whether a communication is absolutely privileged under Russell requires sufficient discovery).

IV.     Intentional Infliction of Emotional Distress ("IIED")

Any IIED claim based on the Clemens' allegedly malicious lawsuit of allegedly defamatory statements must be dismissed as duplicative. <u>Sweeney v. Prisoners' Legal Services of New York, Inc.</u>, 146 A.D.2d 1, 7, 538 N.Y.S.2d 370 (3rd Dep't 1989) ("a cause of action for intentional infliction of emotional distress should not be entertained 'where the conduct complained of falls well within the ambit of other traditional tort liability' . . . conduct complained of in plaintiff's third cause of action falls entirely within the scope of his more traditional tort claim for

defamation) (citing Fischer v. Maloney, 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991

(N.Y. 1978)); Herlihy v. Metropolitan Museum of Art, 214 A.D.2d 250, 262, 633

N.Y.S.2d 106 (1st Dep't 1995) ("the plaintiff's cause of action for intentional

infliction of emotional distress must also fail because it falls within the ambit of

other traditional tort liability which, in this case, is reflected in plaintiff's causes of

action sounding in defamation"); Leonard v. Reinhardt, 20 A.D.3d 510, 799

N.Y.S.2d 118 (2d Dep't 2005) (the cause of action alleging intentional infliction of

emotional distress should have been dismissed as duplicative of the causes of

action alleging malicious prosecution and assault and battery).

       In Hanly v. Powell Goldstein, LLP, No. 05 CV 5089 (KMW), 2007

WL 747806 (S.D.N.Y. Mar. 9, 2007) the court declined to dismiss an IIED claim as

duplicative. The court reasoned: "[a]lthough the two injuries are related to one

another in that they are rooted in the same conduct-the sending of the Rawls letter-

the injuries are different." Id. at *6 n 9. There, the defamation claim involved

harm suffered when plaintiff's integrity was challenged. Id. The IIED claim

involved harm suffered when plaintiff was informed that he was under

investigation. Id. Because the injuries were different, the court found that the

defamation claim did not fully embrace the IIED claim. Id.; see also, Halperin v.

Salvan, 117 A.D.2d 544, 546, 499 N.Y.S.2d 55, 58 (1st Dep't 1986).

       In contrast, here, the injuries allegedly caused by the defamatory

statements are the same whether brought under the defamation claim or under the

IIED claim.  Likewise, the injuries allegedly arising from the malicious prosecution are the same as those alleged under the IIED.  A resolution of the malicious prosecution and defamation claims will fully redress the injuries alleged under the IIED action.  McNamee claims that under the defamation claim he "suffered harm from falsehoods about him, whereas in the IIED claim he suffered from a campaign of harassment, including filing a baseless lawsuit and revealing private information about his child."  (Pl. Opp. Mem. of Law at 35).  The revelation of private information about McNamee's child is the only non-duplicative basis for McNamee's IIED claim.

In any event, the claim for IIED must fail as Plaintiff fails to allege the extreme and outrageous conduct necessary to support such a claim.  IIED imposes liability based on after-the-fact judgments about an actor's behavior. Howell v. New York Post Co., Inc., 81 N.Y.2d 115, 122, 612 N.E.2d 699 (N.Y. 1993).  The requirements of are therefore "rigorous, and difficult to satisfy."  Id. (citing Prosser and Keeton, Torts § 12, at 60-61 (5th ed)).  A plaintiff must allege "extreme and outrageous" conduct to sustain a claim for IIED, behavior that goes beyond the bounds of decency, and would be regarded as atrocious and utterly intolerable in a civilized society.  Shapiro v. Ungar, 873 N.Y.S.2d 237 (Table), 2006 WL 6091599, at *2 (N.Y.Sup. July 18, 2006).  Claims often fail because the alleged conduct was not sufficiently outrageous.  See, e.g., Constantine v. Teachers College, No. 116528/08, 2010 WL 4187655 (Table) (N.Y.Sup. Oct. 13, 2010)

(accusations of plagiarism did not rise to the level of egregious conduct necessary to satisfy the standard for IIED, which requires behavior that "transcends the bounds of decency as to the regarded as atrocious and intolerable in a civilized society"); <u>Montalvo v. J.P. Morgan Chase and Co.</u>, No. 4221/09, 2009 WL 4893939 (N.Y.Sup. Dec. 18, 2009) (allegations involving a threat to cause a plaintiff's arrest, or even to provide the police with false information to cause such an arrest are insufficient to support an IIED cause of action); <u>Fusco v. Fusco</u>, 18 Misc.3d 1124(A), 859 N.Y.S.2d 894 (Table), 2008 WL 307456, at *5 (N.Y.Sup. 2008) ("The law does not compensate for 'threats, annoyances or petty oppressions or other trivial incidents which must necessarily be expected and are incidental to modern life no matter how upsetting'") (<u>citing Lincoln First Bank of Rochester v. Barstro & Associates Contracting, Inc.</u>, 49 A.D.2d 1025, 1025-26, 374 N.Y.S.2d 485 (4th Dep't 1975)); <u>Shapiro</u>, 2006 WL 6091599, at *2 (while the "campaign of harassment and malicious remarks" complained of "would be inappropriate, in the context of this acrimonious litigation, it would not be so atrocious as to shock the conscience of the civilized world"); <u>contra Roach v. Stern</u>, 252 A.D.2d 488, 675 N.Y.S.2d 133 (2d Dep't 1998) (broadcasting radio show in which the cremated remains of plaintiff's sister were fondled and joked about crudely was sufficient to maintain an IIED claim); <u>Marmelstein v. Kehillat New Hempstead</u>, 45 A.D.3d 33, 841 N.Y.S.2d 493 (1st Dep't 2007) (allegations that a counselor gained plaintiffs trust and then advised that her "only hope" of achieving her goal of getting married

and having children was to engage in a course of "sexual therapy" with him satisfied the standard of extreme and outrageous conduct).

Acts that may form the basis of defamation claims and malicious prosecution actions tend not to rise to the level of outrageousness required for IIED.  See Stern v. Burkle, 20 Misc.3d 1101(A), 867 N.Y.S.2d 20 (Table) (N.Y.Sup. 2008) (publishing unfavorable articles about plaintiff was not outrageous conduct); Hebrew Institute for Deaf and Exceptional Children v. Kahana, 21 Misc.3d 1107(A), 873 N.Y.S.2d 234 (Table), 2008 WL 4489936, at *2 (N.Y.Sup. Oct. 3, 2008) (the mere commencement of litigation, even if alleged for the purpose of harassment and intimidation, is insufficient to support a claim for intentional infliction of emotional distress); McRedmond v. Sutton Place Restaurant and Bar, Inc., 48 A.D.3d 258, 259, 851 N.Y.S.2d 478 (1st Dep't 2008) (the conduct complained of-making statements to news media about the litigation-fell far short of the standard required to sustain such a claim).  Outrageousness was not established where the defendant, plaintiff's supervisor, was alleged to have maliciously displayed nude photos taken of plaintiff in connection with his work as a model.  See Anderson v. Abodeen, 29 A.D.3d 431, 816 N.Y.S.2d 415 (1st Dep't 2006).  Outrageousness was also not established when defendant was accused of fabricating an email in plaintiff's name in which plaintiff was made to appear to be a rude, petty, self-absorbed cartoonist and in which people were encouraged to vomit on plaintiff.  Rall v. Hellman, 284 A.D.2d 113, 726 N.Y.S.2d 629 (1st Dep't

2001). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Restatement [Second] of Torts § 46, comment d.  Publishing private or confidential information has not been considered extreme and outrageous.  <u>See Freihofer v. Hearst Corp.</u>, 65 N.Y.2d 135, 480 N.E.2d 349 (N.Y. 1985) (publishing information found in confidential court documents did not rise to the level of "extreme and outrageous" conduct).

While the revelation of private medical information about McNamee's son was certainly malapropos, it cannot be said to shock the conscience of humankind.  For these reasons, Clemens' motion to dismiss McNamee's IIED claim must be GRANTED.

V.      Malicious Prosecution

Finally, we turn to McNamee's claim for malicious prosecution.  McNamee alleges that Clemens filed a defamation action against him in Texas state court based on statements made to the Mitchell Commission and SI.com, knowing that those statements were true and not defamatory.  On February 12, 2009, the District Court in Texas dismissed claims stemming from statements made to the Mitchell Commission and SI.com for lack of personal jurisdiction.  The court also held that McNamee's statements to the Mitchell Commission should be immune

from suit because they were made in the course of a government investigation, Clemens v. McNamee, 608 F. Supp. 2d 811 (S.D. Tex. 2009). Clemens' appeal was denied by the Fifth Circuit in August 2010 and Clemens has filed a petition for rehearing en banc.

In action for malicious prosecution the court must apply the choice of law rules of the state where the underlying action took place. See Caldwell v. Gutman, Mintz, Baker & Sonnenfeldt, P.C., 701 F. Supp. 2d 340, 355 (E.D.N.Y. 2010) (applying Virginia state law to determine the statute of limitations of a malicious prosecution claim); Tripodi v. Local Union No. 38, Sheet Metal Workers' International Ass'n, AFL-CIO,120 F. Supp. 2d 318, 321 (S.D.N.Y. 2000); Seghers v. Morgan Stanley DW, Inc., No. 06 Civ. 4639 (GEL), 2007 WL 1404434, at *8 n. 11 (S.D.N.Y. May 10, 2007) (applying Texas law to malicious prosecution claim); see also, Restatement (Second) Conflicts of Laws § 155 (stating that malicious prosecution and abuse of process claims are generally determined "by the local law of the state where the proceeding complained of occurred"). In Heaney v. Purdy, 29 N.Y.2d 157, 324 N.Y.S.2d 47, 272 N.E.2d 550 (1971), the Court of Appeals held that the law of the forum state should apply in cases involving the intentional torts of false arrest, false imprisonment and malicious prosecution. Citing Babcock v. Jackson, 12 N.Y.2d 473, 483, 240 N.Y.S.2d 743, 750, 191 N.E.2d 279 (1963), New York's highest court announced that, where "plaintiff is claiming that defendant used its legal machinery maliciously . . . it would be almost unthinkable

to seek the applicable rule in the law of some other place." <u>Heaney</u>, 29 N.Y.2d at 159.

Plaintiff's use of <u>Weiss v. Hunna</u>, 312 F.2d 711 (2d Cir. 1963) to argue the contrary is unavailing. In <u>Weiss</u>, an Austrian attorney applied for an injunction in Austria to enjoin a transfer of shares that was to take place in New York. <u>Id.</u> The Second Circuit applied New York law to the abuse of process claim only because Austrian law did not provide the plaintiff with a sufficient remedy to address the injury. <u>Id.</u> Here, Plaintiff has an adequate remedy for malicious prosecution through an application of the law of the forum state.

In Texas, a plaintiff who alleges malicious prosecution of a civil claim, must establish: "(1) the institution or continuation of civil proceedings against the plaintiff; (2) by or at the insistence of the defendant; (3) malice in the commencement of the proceeding; (4) lack of probable cause for the proceeding; (5) termination of the proceeding in plaintiff's favor; and (6) special damages." <u>Texas Beef Cattle Co. v. Green</u>, 921 S.W.2d 203, 207 (Tex. 1996). We need not address the substantive elements of this claim, as McNamee cannot establish the last two elements: the underlying decision has been appealed and he has not alleged special damages under Texas law.

Under Texas law, a judgment is not final for malicious prosecution purposes until the appeals process has been exhausted. <u>Montemayor v. Ortiz</u>, 208 S.W.3d 627, 651 (Tex. App.—Corpus Christi-Edinburg 2006); <u>Texas Beef Cattle</u>

<u>Co.</u>, 921 S.W.2d at 208 ("the rule we adopt today is in accord with the Restatement: 'If an appeal is taken, the proceedings are not terminated until the final disposition of the appeal and of any further proceedings that it may entail'") (<u>citing</u> Restatement (Second) of Torts § 674 cmt. j (1977)).  While a number of claims were terminated in McNamee's favor by the Fifth Circuit, Clemens has not fully exhausted the appeals process in that matter.

McNamee argues that the malicious prosecution claim is proper because Clemens had not yet appealed the Texas case when it was filed.  However, he cites no caselaw for this proposition.  Judgments are not treated as final prior to appeal in malicious prosecution cases in order to prevent the "repetitive and unnecessary litigation" that would occur by allowing "the plaintiff to prosecute a claim only to have it rendered meaningless if later all or part of the appeal of the underlying action is decided adversely."  <u>Texas Beef</u>, 921 S.W.2d at 207-08.  This purpose would be subverted by allowing plaintiffs to bring claims for malicious prosecution where they are able to file suit before the defendant has appealed the underlying action.  McNamee's claim for malicious prosecution is thus premature until Clemens' appeal is resolved.

Even if the appeal terminates in McNamee's favor, his malicious prosecution claim must fail because McNamee has not pleaded special damages.  In <u>Texas Beef Cattle Co. v. Green</u>, 921 S.W.2d 203 (Tex. 1996), the Texas Supreme Court explained that "[a] plaintiff must suffer a special injury before recovering for

malicious prosecution of a civil case. . . There must be some physical interference with a party's person or property in the form of an arrest, attachment, injunction or sequestration." Id. at 208-09. Harm done to a person's professional reputation is not special damage in Texas. See Martin v. Trevino, 578 S.W.2d 763, 767 (Tex. Civ. App.—Corpus Christi 1978), nor are "the ordinary losses incident to defending a civil suit, such as inconvenience, embarrassment, discovery costs, and attorney's fees." Texas Beef, 921 S.W.2d at 207. This rule was adopted by the Texas Supreme Court "to assure every potential litigant free and open access to the judicial system without fear of a countersuit for malicious prosecution." Martin, 578 S.W.2d at 767. In Finlan v. Dallas Independent School District, 90 S.W.3d 395 (Tex. App.—Eastland 2002), one plaintiff claimed "he suffered damage to his reputation, pecuniary losses, adverse tax losses, personal injuries, a loss of ability to obtain credit, and a loss of property interests, including the rights to speak and vote," and another claimed "damage to his reputation and economic losses that forced him to close his Dallas office." Id. at 406. However, the court held that "the types of 'reputation' damages and 'business loss' damages claimed by [the plaintiffs] do not satisfy the 'special injury' requirement for malicious prosecution claims." Id. For these reasons, Plaintiff's malicious prosecution claim must be DISMISSED.

## CONCLUSION

For the reasons set forth above, this Defendant's motion to dismiss the action pursuant to Fed. R. Civ. P. 12(b)(1) is DENIED and Defendant's motion to dismiss the action pursuant to Fed. R. Civ. P. 12(b)(6) is GRANTED with respect to Plaintiff's malicious prosecution, IIED, and defamation claims based on statements that McNamee has a mental disorder and statements that McNamee is extorting Clemens and DENIED with respect to Plaintiff's remaining defamation claims.

SO ORDERED.

DATED: February 4, 2011                              /s/ Judge Sterling Johnson Jr.
        Brooklyn, New York                    United States District Court Judge